CITY OF ST. LOUIS v. ST. LOUIS & SAN FRAN-
CISCO RAILROAD COMPANY and ST. LOUIS
& SAN FRANCISCO RAILWAY COMPANY,
Appellants.

Division One, June 14, 1910.

1. **INSTRUCTIONS: Law Case: Tried to Court.** In a law case tried to the court without the aid of a jury declarations of law are not of so much significance as they would be in a trial to a jury. Given or refused they are chiefly of value to determine the theory upon which the trial court decided the case.

2. **BRIDGE ACROSS RAILROAD TRACKS: Recovery Against Company: Wood: Durability.** Where the city ordinance, which the railroad accepted, required it to pay a certain sum to the

city for each bridge thereafter constructed across its railroad tracks, but says nothing as to the material of which it is to be constructed, the company cannot escape payment by a showing that iron, steel, concrete, and solid masonry for abutments, were not used, but that only wooden trestles, beams and supports were, and that such a wooden bridge would last only a few years. The real issue to be decided, in such case, is whether the material used was reasonably durable and permanent, and whether the bridge was reasonably well constructed; and if the court, sitting as a jury, finds in the affirmative, and there is substantial evidence to support that finding, it will not be disturbed on appeal.

3. ———: ———: **Proximity of Bents to Tracks.** Where the court declared the law to be that if the bents of the bridge were placed so close to the railroad tracks as to be dangerous to employees operating trains, the city could not recover from the company its proportionate cost of the bridge, and there was no evidence that the bents were placed so close to the main tracks as to be dangerous, and the evidence as to the dangerous proximity of other bents to side tracks was conflicting, the finding of the trial court on the point will not be disturbed.

4. ———: ———: **Custom Implied in Contract: Practical Construction.** Where the railroad company in writing (by ordinance and its acceptance thereof) agreed to pay the city a definite sum for each bridge constructed by the city over its tracks, and there is no doubt as to the contract's meaning, but it is plain and unequivocal, a plea to the city's suit for said sum that a general and established custom was implied by said agreement, namely, that all surface crossings on so much of the street as was not occupied by the bridge would be abandoned, and that the city had in numerous other cases, both before and after the company entered into said contract, put a practical construction on the contract by removing like surface crossings, thereby relieving the company of the burden of maintaining gates, watchmen, etc., should be stricken out.

5. ———: ———: ———: **Grants by Public: Monopoly.** In grants by the public nothing passes by implication. If, on a fair reading of the instrument, reasonable doubts arise as to the proper interpretation to be given it, those doubts are resolved in favor of the public—the State or the municipality making the grant; and where it is susceptible of two meanings, the one restricting and the other extending the power of the corporation to which the grant is made, that construction will be adopted which works the least harm to the public. A privi-

lege granted by a city to cross its streets at designated points is in the nature of a monopoly, and any ambiguity in a grant of an exclusive privilege to a corporation will be resolved in favor of the public, and nothing will be implied to have been granted where the contract is not ambiguous.

Appeal from St. Louis City Circuit Court.—*Hon. Matt. G. Reynolds,* Judge.

AFFIRMED.

*W. F. Evans* and *J. G. Egan* for appellants.

(1)    An ordinance to be valid must be reasonable. Dillon on Mun. Corp. (4 Ed.), sec. 319; Corrigan v. Gage, 68 Mo. 541.    (2)    A contract should always be given a just, fair and reasonable construction.    17 Am. and Eng. Ency. Law (2 Ed.) 18; 9 Cyc. Law and Proc. 587; Clarke on Contracts (Ed. 1894) 593, 595; Lawson on Contracts, sec. 389; McManus v. Shoe Co., 60 Mo. App. 216.    (3)    In construing a contract, the law will imply whatever is necessary to give it a just, fair and reasonable meaning, and to carry out what is inherent in the nature of the transaction.    Chouteau v. Railroad, 122 Mo. 386; Union Depot Co. v. Railroad, 113 Mo. 225; State v. Gas Co., 102 Mo. 485; Renn v. Supreme Lodge, 83 Mo. App. 446; Fox v. Tyler, 109 Fed. 258; Genet v. Canal Co., 136 N. Y. 609; 1 Story on Contracts (5 Ed.), sec. 20; 17 Am. and Eng. Ency. Law, 26; 9 Cyc. Law and Proc. 252, 582, 587, 588; 2 Parsons on Contracts (9 Ed.), bottom pages 670, 671; Bishop on Contracts (Enl. Ed.), secs. 241, 253, 439; Lawson on Contracts, sec. 33-C, sec. 55. (4)    The surrounding circumstances and subject-matter should be considered in construing a contract. Construction Co. v. Tie Co., 185 Mo. 62; Whitehead v. Begley, 99 Mo. 456; Silver v. Mo. Co., 101 Mo. 90. (5)    It is proper to show the practical construction which the parties give to a contract upon any point not expressly explained in the contract, or on which

there is a latent ambiguity. Tetley v. McElmurry, 201 Mo. 382; Laclede Co. v. Tie Co., 185 Mo. 25; Meyer v. Christopher, 176 Mo. 580; Green v. Higham, 161 Mo. 333; St. Louis v. Gas Light Co., 155 Mo. 1. (6) It is proper to show the established and general usage in the locality on the subject-matter covered by the contract, where the point is not expressly provided for in the contract. Silver v. Mo. Co., 101 Mo. 79; Estes v. Shoe Co., 155 Mo. 577; Sims v. Insurance Co., 47 Mo. 54; Evans v. Brass Mfg. Co., 118 Mo. 548; Cole v. Skrainka, 105 Mo. 310; Pollock on Contracts (7 Eng. Ed. 1902), 253-255; Clarke on Contracts, 580, 581; Long v. Armsby Co., 43 Mo. App. 253; Cameron v. Real Estate Co., 76 Mo. App. 366. (7) In the absence of an express agreement on a point, the law requires that any construction shall be built in a workmanlike manner, with good material, and that it shall be suitable for the purpose intended. Pump Co. v. Mfg. Co., 84 Mo. App. 204; Wait on Engineering and Architectural Jurisprudence, sec. 256. (8) Where a right of action does not exist at the time the action is begun, the right to maintain the suit cannot be acquired by subsequent acts or events. Heard v. Ritchey, 112 Mo. 516; Turk v. Stahl, 53 Mo. 438; Mason v. Barnard, 36 Mo. 391; McDowell v. Morgan, 33 Mo. 555; Payne v. School District, 87 Mo. App. 415; Werth v, Springfield, 22 Mo. App. 12.

*L. E. Walther* and *B. H. Charles* for respondent.

(1) This court will not reverse except for errors which materially affect the merits of the action. R. S. 1899, sec. 865. (2) The trial court found the issues of fact against the defendants, and this court will not weigh the evidence thereon. Van Liew v. Barrett, 144 Mo. 509. (a) The trial court found the bridge to be a reasonably durable and permanent structure. (b) The trial court found that the bents of the bridge are not so close to the tracks as to be dangerous for

the employees of the railroad, nor for the operation of trains. (3) The special defenses really amount to a bill to reform the contract. (4) All the terms of a municipal contract must be in writing, and no change thereof can subsequently be made by construction, by implication, nor by conduct of legislative officials. R. S. 1899, sec. 6759; Charter of St. Louis, art. 16, sec. 7; Taylor v. School District, 60 Mo. App. 372; Woolfolk v. Randolph County, 83 Mo. 501; Louisiana v. Shaffner, 104 Mo. App. 101; McGrath v. St. Louis, 215 Mo. 207; State ex rel. v. Dierkes, 214 Mo. 578; Memphis v. Brown, 20 Wall. 289; Campau v. Detroit, 106 Mich. 414; O'Hara v. New Orleans, 30 La. Ann. 152; Boston El. Co. v. Cambridge, 163 Mass. 64; Wickwine v. Elkhardt, 144 Ind. 305. (5) The provisions of statute and charter that municipal contracts shall be in writing, are designed, among other things, to prevent any provision of such a contract being left to inference or to proof of extraneous facts. (6) There is no ambiguity in the contract; but, if there were, it would be construed in favor of the public. Stein v. Water Co., 141 U. S. 67; McQuillin on Municipal Ordinances, sec. 578; Philadelphia v. Tel. Co., 11 Phila. 327; Mining Co. v. South Carolina, 144 U. S. 550; Trust Co. v. Cincinnati, 73 Fed. 716. (7) Where the legislative meaning is plain, it is contrary to the canons of construction to apply any rules to aid in its interpretation. The legislative meaning is to be enforced according to its obvious terms. Bishop on Written Laws, sec. 72; U. S. v. Allen, 58 Fed. 866; U. S. v. Goldenberg, 168 U. S. 95. The legislative intention must be derived from the words of the ordinance and not from conjectures *aliunde*. Gardner v. Collins, 2 Pet. 86; Cargo v. U. S., 7 Cranch 60; Market v. Hoffman, 101 U. S. 116; Petrie v. Bank, 142 U. S. 650; McBroom v. Investment Co., 153 U. S. 323. (8) Ordinance 21346 is a valid exercise of a legislative function of the municipal assembly. It was the function of that

body alone to determine how the Kings Highway bridge should be built and where its supports should be placed. St. Louis v. Railroad, 211 Mo. 364. (9) Even on the assumption that the city is under some sort of obligation not expressed in the contract to compel the public to cease altogether the use of the crossing at grade, and to shut off the owners of property abutting on the highway at the original grade from access thereto, this obligation is not one that is a part of the contract respecting the bridge, and if such an obligation exists at all it is one to enforce which the defendants must seek some other remedy—perhaps by injunction or by mandamus. It is not proper matter of defense in this action, and the allegations in reference thereto were properly stricken out of the answers.

LAMM, P. J.—Defendants appeal from a judgment in favor of plaintiff city for $15,000, with interest at six per cent per annum from April 1, 1904, aggregating $17,507.50, for building a bridge on Kings Highway over their tracks.

In June, 1881, the Municipal Assembly of the city of St. Louis passed an ordinance, No. 11725, authorizing the defendant *railway* company to enter the city from the west on the condition, *inter alia,* that it accept the ordinance. Due acceptance was made, and presently it ran its tracks into the city by virtue of such ordinance and acceptance.

In 1896 defendant *railroad* company became owner of the property, business, rights of way and franchises of defendant *railway* company and, as such successor, is now the owner of its rights, privileges, franchises and properties, and is operating the railroad in question, claiming (*cum onere*) the rights vested in its predecessor under ordinance 11725.

There being no contention that both defendants are not liable if one is, to avoid confusion we will refer to both indiscriminately as the Frisco.

Attending to ordinance 11725, for our purposes its substance alone is material, *viz*:

By section one permission and authority was granted to the Frisco to extend, construct, maintain and operate its railroad from the western line of the city eastward by the most practical route across a great many streets, roads and avenues, including a north-and-south thoroughfare known as Kings Highway, to a street then known as Tayon avenue, but now known as 18th street. Said section marks out the route by points, courses, distances and designations immaterial here.

Section two grants authority to the Frisco to construct and operate one or more of its tracks on Gratiot street on conditions named.

Section three relates to the interruption of public travel in laying tracks across the many designated streets and that the track laying should be under the supervision of the Board of Public Improvements, etc.

Section four designates speed limits and provides police regulations for the public safety, such as sounding bells on moving locomotives, manning trains with experienced brakemen, the maintenance of gates, watchmen at crossings, etc.

Section five provides that the Frisco must file its written acceptance of the provisions of the ordinance and a bond in the sum of $100,000, conditioned on its faithful observance of the provisions of the ordinance, before it shall lay its tracks across any street.

Section six is a provision requiring a plan and profile of its proposed tracks showing elevations and grades, etc., to be filed before it shall construct any of its road within the city limits, and reserves to the city the right to change the grade in certain contingences.

This suit is instituted under section seven, reading;

"Sec. 7. The St. Louis and San Francisco Railway Company shall pay into the city treasury for

each bridge hereafter constructed across its railroad tracks, in the city of St. Louis, west of Tayon avenue, and including said avenue, the sum of fifteen thousand dollars; said payments to be made within thirty days after the construction of the bridges is commenced.''

Section eight relates to interference with water pipe and sewers in the construction of the railroad, and section nine is a provision requiring trains to be run between certain hours within the city limits and regulates passenger fare on such trains.

It seems the tracks of the Frisco at the *locus in quo* run in the Mill creek valley; that at that point the tracks of the Missouri Pacific parallel those of the Frisco; that the right of way of the latter is one hundred feet wide; that Kings Highway, crossing all said tracks, is also one hundred feet wide, running about parallel with the Mississippi river, and is the most western street connecting the north and south parts of the city; that there is no through street east of it for a great ways; that public travel thereon has much increased with the development of St. Louis in that region; that the Louisiana Exposition was about to be held; and that municipal and public attention in 1903 was sharply directed to the matter of public travel over grade crossings, as an incident to that exposition.

In this condition of things, in December, 1903, the Municipal Assembly of St. Louis passed an ordinance, No. 21346, providing for a bridge in Mill creek valley on Kings Highway over the railroad tracks there, so that travel on Kings Highway would not be obliged to take the grade crossing, but could avoid the dangers of such crossing and the heavy grade down into the valley and up out of it by using the bridge.

The ordinance in effect, follows:

Section one authorizes and directs the Board of Public Improvements to cause a bridge to be constructed on Kings Highway across the tracks of the Missouri Pacific and Frisco railroads in accordance

with plans and specifications now on file in the office of such board and in that of the street commissioner.

Section two provides that the bridge shall be built of wood, except that portion over the railroad tracks which was to be a combination of wood and steel. The bridge roadway was to be thirty-two feet wide, paved with five-inch blocks resting on three-inch planking. On either side of the roadway was a sidewalk seven feet wide of two-inch planking with a railing on the outside.

Section three provides that the city shall pay the costs, and appropriates the sum of $40,000 therefor. Other provisions direct that appropriation shall be made out of the Municipal Revenue Fund for streets, bridges and culverts; that the City Auditor transfer that amount, etc.

Under ordinance 21346 bids were received and the contract to build the bridge was awarded to the R. M. Quigley Construction Company. There is no call to set forth the details of the plans, drawings and specifications. Suffice it to say that the contract calls for roadway and sidewalk planks of cypress, for white and yellow pine lumber, for sound live-timber cedar paving blocks, for sound lumber free from windshakes and large or rotten knotholes, for eyebeams free from cracks and flaws, for cast iron railing and posts free from blowholes and other defects. The subsills were to have a full and even bearing on the ground. The interstices between blocks in the paved roadway of the bridge were to be filled with hot gravel screened, free from sand, well rammed and then asphalt paving cement of the best quality was to be poured hot into all the interstices until they were full and the surface of the blocks covered. The blocks were to be five inches long and from four to eight in diameter, sawed at right angles to the axis. Drawings were incorporated into the contract by references: First, a general elevation plan; second, details of the different spans; third, de-

tails of steel work; fourth, details of railing. The bridge, including roadway and sidewalks, was forty-six feet in width. This left of the one hundred feet of Kings Highway a twenty-seven-foot strip for a side-street on grade at each side of the bridge, and these side streets were to be left unobstructed throughout the progress of the work. The work was to be under the supervision of the Street Commissioner, who was the referee in case of dispute. The payments were not to exceed the amount appropriated by ordinance 21346. The work was to begin within one week after written notice to the contractor, and the city was to pay $29.20 per 1000 feet (board measure) for lumber, 3 3-4 cents per pound for steel work, $2.35 per lineal foot for railing, and $14 per square (of one hundred super-ficial feet) for paving.

The construction company performed, the bridge was built in accordance with the contract, and thrown open to travel in May, 1904. It was 1400 feet long from out to out. The abutments were of pine-timber caging filled with dirt. The upright posts in the bents were of sawed pine timber, 12 by 12. The spans varied in length.

Many photographs were introduced below and were preserved in the record. We will present two of them. They will convey a clearer idea of the bridge than the wilderness of verbal descriptions of the witnesses and the dimensions, measurements, etc., with which the record profusely abounds. The first photograph is of a part (a side view) of the central section of the bridge over the tracks and indicates the design and character of construction supporting the super-structure; the other one is a view of the roadway and sidewalks of the superstructure, showing the railing, lamp posts, etc., together with a lumber plant and brick plant in the Mill creek valley which establish-ments used the grade crossing after the bridge was built and which will be again referred to.

228 Sup—46

St. Louis v. Railroad.

Under some spans, two of the Frisco tracks ran; under others, one. The bridge is of a class known as wood-trestle bridges. It cost the rise of $40,000 originally. Later, for reasons foreign to any issue in this case, a concrete pier was built at the south approach costing $6000, so that in round numbers its total cost was $46,000.

In due time demand was made for the $15,000 to be paid under section seven of ordinance 11725, and, on failure to pay, suit was brought in two counts. The first was on the bond given under section five of said ordinance. The second was on the contract evidenced by section seven and the acceptance of the ordinance by the Frisco. The petition is unassailed and need not be reproduced. Finally the first count was dismissed and is out of the case. To the second count defendants filed separate answers, which (*mutatis, mutandis*) for the practical purposes of this appeal, may be taken as the same. Therefore one will do for both.

On motion a part of both answers was stricken out. The answer is too long to reproduce *totidem verbis.* The substance of the defense left standing and of the matter struck out will do for appellate purposes. That part of the answer to the second count unaffected by the motions to strike out and on which the trial issues were framed is, in substance, as follows:

It is admitted that plaintiff is a municipal corporation; that ordinance 11725 and the acceptance of the Frisco created a contract between it and the city. The acceptance is pleaded in full, and the ordinance as set forth in the second count of plaintiff's petition is admitted. It is next alleged that it is an *implied* provision and condition of the ordinance, acceptance and contract that any bridges to be constructed on Kings Highway over the railroad tracks, or at any other place prescribed in the ordinance, "should be planned, de-

signed, constructed and maintained in a safe, skillful, proper and durable manner'' of proper and durable material and of a permanent character so that they would last for a reasonable length of time and so that railroad tracks under them could be safely and conveniently operated without danger or risk to. the servants of the railroad. It alleges that said implied term or provision was breached by plaintiff in that the bridge is not a safe, skillful or durable plan or construction or of a permanent character, but was unsafe and improperly planned, constructed and maintained, was of a temporary character, built of improper and insufficient material, will not last a fair or reasonable length of time but will wear out and become entirely useless and of no value in a few years; that it is merely a wooden, temporary trestle bridge with wooden timbers and bents of a temporary and insufficient character. It is next alleged that the Frisco had seven tracks across Kings Highway; that some of the timber bents or trestles had been placed and are now maintained so close to the tracks that it is unsafe and dangerous to operate defendants' engines and cars at that place; that defendants' employees cannot safely work there in operating the cars; that loaded cars cannot be conveniently transported upon the tracks; that the loads on the cars frequently strike the bents or trestles because they were placed too close to the tracks—all of which was in violation of ordinance 11725, the acceptance thereof and the contract created thereby. It is next averred that the bridge is wide enough and furnishes ample accommodations for the passage of all public travel upon Kings Highway over said crossing. (*Note*: In this connection complaint is made that the grade crossing for the two narrow side streets or passage ways, one on either side of the bridge, was not vacated and abandoned. This matter was stricken out, as will presently appear.) Finally, the pleader alleges that by reason of the

premises and of the said failure, breaches and viola-
tion of the contract, etc., the Frisco is not bound to
pay any sum for constructing the bridge.

So much for the answer left standing after the
motions to strike out were passed on.

The motions to strike out were leveled in part at
the following allegations of the answer (giving sub-
stance only):

(1). Allegations that plaintiff city, in violation of
ordinance 11725, the acceptance thereof and the con-
tract, had kept open and in use, at grade, wagon and
foot ways on Kings Highway on each side of the trestle
bridge and declares its intention to maintain such
grade crossings and had requested the Frisco railroad
to plank said passageway and to maintain gates and
gatemen thereat, although such grade passageways
have not been paved nor improved, that the grade
passageways are dangerous to those using the grade
crossing, to the employees of the Frisco, and to pas-
sengers upon its trains and cast upon said railroad a
heavy expense to guard against collisions and acci-
dents; that such expense is greater than if the bridge
had not been built; that the bents and supporting tim-
bers of the trestle bridge are close together and
obstruct the view of trainmen and of the flagman main-
tained by the Frisco at the crossing, and of travellers
using the grade crossing, whereby it is made difficult
to avoid collisions and accidents; and that because of
the maintenance of said grade passage by plaintiff city
a considerable and substantial travel uses the grade
crossing instead of the trestle bridge.

(2). Allegation that at the time of the passage
of the ordinance 11725 and its acceptance and ever
since that time it was the regular, established and
general practice, use and custom throughout the city
of St. Louis and State of Missouri to abolish grade
crossings at places where bridges were constructed for
public travel over railroad tracks; that the ordinance,

acceptance and contract created thereby were passed
and made with reference to such custom and usage,
whereby it became an *implied* part, provision and condition of the ordinance, acceptance and contract; and
that such implied term applied to the Kings Highway
bridge and required the abandonment of the grade
crossing there.

(3). Allegations that plaintiff city has put a
*practical construction* on the contract in accordance
with the custom, usage, implied term and conditions
set forth in paragraph 2 above, *viz.,* that the grade
crossings were abolished at Jefferson avenue when a
bridge was built in April, 1881; at Grand avenue when
a bridge was built in August, 1889; at Twenty-first
street when a bridge was built in July, 1892, and at
Chouteau avenue when a bridge was built in November,
1902. The answer is a bit obscure on one point. For
instance, ordinance number 11725 was passed in June,
1881. It was accepted by the Frisco in July, 1881.
Bearing these dates in mind, it is alleged that a bridge
over Jefferson avenue was completed in April, 1881
(that is before the passage of ordinance 11725), that
the grade crossing was disused and abandoned at that
time in pursuance of ordinance No. 11725, the acceptance thereof and the contract created thereby, and
that such fact was a practical construction thereof to
which the plaintiff city and the Frisco railroad at all
times assented and concurred. To further the theory
of a practical construction the answer pleads a certain
other ordinance of plaintiff city, *viz.,* number 17189,
of date April 7, 1893, and section 1748 of the Municipal
Code of St. Louis adopted April 3, 1900, and now in
force, providing that persons, associations or corporations, operating engines or cars propelled by steam on
tracks along or across streets, avenues or roads used
for wagon travel shall erect gates at such crossings,
at which gates (unless automatically opened and
closed) such corporation, etc., shall keep watchmen

having certain specified duties, and such gates were to be erected within thirty days after notice from the Street Commissioner. There is a proviso to the effect that the ordinance shall not apply where the crossing for public travel on the road or avenue is bridged over the tracks, and shall not apply to avenues or roads on which tracks are laid used exclusively for switching or for switch tracks. That the ordinance just pleaded also gave a practical construction to ordinance 11725 to the effect that the grade crossing should be disused and abandoned upon the construction of a bridge and was declarative of a rule and policy to that effect, to which construction, rule, etc., the Frisco has at all times assented and concurred.

(4). Allegations that all the bridges constructed by the city of St. Louis at places referred to in ordinance 11725, except the Kings Highway bridge, were constructed and maintained in a durable manner and of durable material with substantial supports and abutments and not of trestle work and are of a permanent character; that plaintiff gave thereby a practical construction to ordinance 11725, the acceptance and the contract to the effect that bridges should not be of trestle work and of a temporary character, such as the bridge in question, but should be permanent with substantial supports and abutments—to which practical construction the Frisco at all times assented and concurred.

Finally, it is averred that the acts and omissions of plaintiff in the premises were unreasonable, oppressive and unlawful, in violation of the intent and meaning of ordinance 11725, the acceptance thereof and the contract created thereby as well as of said ordinance 17189 and of said section 1748.

The court struck out the matter summarized in paragraphs 1, 2, 3, and 4, defendants saving their exceptions by term bills.

At a subsequent term plaintiff replied to so much
of the answer as was left standing, by way of denial
of every allegation of new matter.

Learned counsel assail the judgment by an array
of twenty-six assignments of error. The first fourteen
are predicated of error in sustaining the motions to
strike out. They may be grouped as one. The next
six are predicated of alleged errors in declaring, and
refusing to declare, the law. They may be grouped
as one for our purposes. The next six are the "usual"
errors said to be committed, *nisi*—in this instance, in
rendering judgment for plaintiff and not for defend-
ants, and overruling the motions for a new trial and in
arrest.

By agreement the cause was tried to the court
without the aid of a jury. Therefore declarations of
law are not of so much significance as they would be
in a trial to a jury. Such declarations, given or re-
fused, are chiefly of value to determine the theories
upon which the trial court decided the case.

The case, in vital features, may be disposed of by
a consideration, first, of two mandatory instructions
in the nature of demurrers to the evidence asked by
defendants respectively and refused; and, second, by
a like disposition of the ruling on the motions to strike
out.

I. *Of the demurrers.* Keeping in mind facts al-
ready stated, a proper consideration of the mandatory
instructions in the nature of demurrers seeks more of
the record. The trial court, as seen, left standing as
defenses those allegations pertaining to, first, a bridge
of reasonable permanence, not a mere temporary make-
shift or a bridge in name only; and, second, the allega-
tions pertaining to the dangerous character of the con-
struction whereby the operation of defendant's trains
was unreasonably interfered with. The rulings of the
learned trial judge were to the effect that plaintiff

could not recover the *pro rata* share provided by the contract if either of these defenses was sustained by the proof. Accordingly a mass of testimony was introduced by both sides on those issues. Of them in their order.

(a). As to durability and permanence. Although the court struck out the defense based on custom and use, yet on the issue of reasonable durability and permanence the testimony took a range wide enough to cover the use and custom in overhead bridge building for public travel in St. Louis and elsewhere over railroad tracks. There was testimony tending to show that the average life of a wooden bridge, such as this, was from eight to ten years; that in that time timbers most exposed to the ground would begin to rot and need replacing if the structure was to be kept in reasonable repair for use; that it was practical and usual to repair such bridges by replacing decaying timbers from time to time or by gradually changing the character of the bridge from wood to steel or concrete or masonry; that such alterations could be made by replacing wooden abutments with concrete or masonry, or replacing the timber posts with steel, etc., and was allowable reconstruction according to approved bridge architecture. It was shown that to build a bridge of the width of Kings Highway (100 ft.) of steel or concrete or of the length of this bridge would have cost one-half million dollars and to have built one forty-six feet wide (as was this) and of the same length would have cost one-quarter million; that the funds at the command of plaintiff in 1903 and 1904 were not adequate for building any such bridge. That there was present demand and need for a bridge at Kings Highway. There was evidence to the effect that wooden bridges are not now considered the best construction and the use of timber is not so much in evidence in that behalf as formerly. This was put on two grounds; first, the scarcity of timber and the

increased cost of good material of that kind; and, second, because concrete or steel or iron, while the most expensive at the outset, is the most economical in the long run. Yet wooden bridges are still built, and yet it was shown that the Frisco and other railroads usually built wooden bridges for public travel on highways crossing railroad tracks whenever they put them in. There is no evidence of any probative force that this bridge was not a reasonably fair and honestly built bridge, considering it was wood with steel eyebeams in that section over the tracks. There were no mechanical defects shown in its construction and nothing to show that it was a mere temporary makeshift, unless all wooden bridges can be condemned as so temporary and flimsy as to not come up to the modern definition of the word "bridge," as used in ordinance 11725 in the year 1881. It was shown that the gases from the smoke of locomotives corrode steel and iron; that (unless protected) steel construction may, under given conditions, last but a few years, but if properly protected by a concrete coating it is the opinion of scientific people that a steel bridge may last fifty or seventy-five years. To properly protect a steel bridge, subject to a great quantity of locomotive smoke constantly, is still somewhat of an open problem—steel bridges being a construction not over fifteen or twenty years old. Some experts thought steel could be protected at the cost of one-half of one per cent. *Contra*, there was testimony that it would require twenty per cent increase when the additional weight of a concrete covering is considered.

It is not necessary to go further into the vast details of the testimony. They cover much of the history of bridge building over tracks in St. Louis for many years. The upshot of it all was that defendants were unable to show that the word "bridge" used in the year 1881 in ordinance 11725 meant, by usage and understanding in bridge architecture or in

practical construction, a concrete or steel bridge or one with solid masonry for abutments, as against a wooden trestle structure such as the one in question.

On such record we rule:

That durability and permanence are merely relative terms. Some wooden bridges would be temporary as compared with other wooden bridges. Again wooden bridges would be short-lived and, colloquially, might be termed "temporary" as compared with iron, steel or concrete.

That to read the words steel, iron, concrete or solid masonry into the contract, as defendants' counsel ask us to do, would be to make a new contract between the parties.

That (absent a contract designation of material) whether a municipality shall build a bridge out of bridge material commonly used like wood, or out of other material commonly used like iron, concrete, steel or solid masonry must depend upon the length of the purse of the municipality as compared to the length of the bridge, or on the character and extent of the travel at a given point, and on aesthetical ideas of architectural beauty—all of which later rest in the legislative discretion of the municipal assembly. While courts will not enforce unreasonable ordinances, yet there is a presumption that municipal assemblies have exercised their discretion reasonably, and in this case the presumption agrees with the fact itself.

And, finally, that absent any substantial structural defect in a wooden bridge, as here, making it unreasonably short-lived or of little value, the court would not have been justified in sustaining the demurrer on the ground of lack of durability and permanence. In this connection the court gave defendants' two instructions indicating a correct view of the law, viz.:

"3. The court declares, as a proposition of law, that if the viaduct in question constructed by the plaintiff at Kings Highway is not a reasonably dura-

ble and permanent structure, then the plaintiff is not entitled to recover from either of the defendants.

"4. The court declares, as a proposition of law, that if the viaduct in question constructed by the plaintiff on Kings Highway was not constructed of reasonably durable and permanent material, and mode of construction, then the plaintiff is not entitled to recover from either of the defendants."

Having so formulated the law, the court found the facts against defendants. There was substantial evidence warranting such finding. We would not be justified in interfering with it any more than we would with the verdict of a jury where substantial proof supported it. Accordingly the point now up is ruled against defendants.

(b). Of the unreasonable interference with the operation of trains because of the dangerous proximity of the posts of the bridge. Bearing in mind the allegations in that behalf left standing in the answer, the theory of the trial court may be further gathered from the following instruction given for defendants:

"8. The court declares, as a proposition of law, that if the viaduct in question constructed by the plaintiff at Kings Highway was constructed with the bents so close to the tracks of the defendant St. Louis & San Francisco Railroad Company as to be dangerous to the life or limb of any of its employees engaged in operating its engines, trains or cars over said railroad tracks at said place, then the plaintiff is not entitled to recover against either of the defendants."

Going still deeper into the facts in order to determine the point, it appears that the Frisco has two main tracks passing under the bridge. All sides seem to agree that the upright posts of the bridge bents were not unreasonably close to them. At any rate, the weight of the evidence lay with that view. They seem to have a reasonably safe clearance. The real dispute relates to a safe clearance for side tracks. It seems

that when plaintiff came to build its bridge it had to ad-
just the structure to a crowded condition of the right of
way of the Frisco. It appears that the plan of the pro-
posed bridge as drafted by the engineers of the city,
showing the length of the spans and the location of the
bents with reference to the tracks, was submitted to the
chief engineer of the Frisco. He did not disapprove
of these plans. He pointed out the close proximity of
the bents to some of the side tracks, regretted it was
so, but acquiesced (as we gather) *because it was the*
*best that could be done.* The Frisco did not then sug-
gest moving its tracks and made no offer in that di-
rection, but saw the bridge go up without protest.
There is much evidence on what is a safe clearance.
Witnesses differed in this regard and plaintiff put in
some evidence that the location of these bents left a
reasonably safe clearance. There was testimony that
a wider clearance was necessary on the main tracks
than on sidings; that there was no arbitrary standard
for a clearance, but that the engineering problem on
that score takes color from the crowded space and
lack of sufficient ground in cities or ample space else-
where. Defendants introduced evidence tending to
show that the clearance on some of these sidings was
not safe for trainmen at the outset, especially for
wide furniture cars. It was shown that a car loaded
crosswise, we assume with dimension stuff of some
sort, scraped one post; that at least one man was killed
by leaning out of his train to make an observation on
the track; and that two or three minor accidents hap-
pened to employees coming in contact with these bents
in 1904 and 1905. It is not shown that the Frisco was
out one dollar because of damages from the proximity
of these posts to the tracks, or that the free movement
of any trains was at any time interfered with by day
or by night. But it must be conceded there was some
evidence tending to show that the original alignment
of some of the bents in proximity to the siding tracks

was somewhat dangerous to employees who, forgetful of their surroundings, leaned out far enough to come in contact with them in going up or down the sides of cars. However there is nothing in this record tending to show that plaintiff was any more to blame for such condition than the Frisco. The city did not select the situation or make it. It had to take it as it found it in 1904, or do without the bridge, and that situation resulted from the Frisco's voluntary arrangement of its siding tracks, it at all times standing charged with notice that the city had the right and might elect to build a bridge. There was testimony of other posts, piers and obstructions being erected and maintained by the Frisco and other railroads in St. Louis closer than the bents of this bridge to some of the switching tracks, and others (the most of them) at a greater distance.

In the fall of 1905 the city entered into a negotiation with the Frisco looking to a realignment of some of the bents provided the Frisco would move its tracks to permit it. These negotiations resulted in the Frisco moving some of its tracks and in plaintiff moving some of its bridge bents, giving about a foot more clearance for some of the sidings.

On such record we are of opinion, first, that the court gave defendants as favorable declarations of law as they were entitled to; and, second, that there was substantial evidence upon which the court could find against defendants on the merits of the issue. It is a case of conflicting testimony and we will not meddle with the finding of fact below.

We hold, then, that the demurrers were properly overruled.

II. *Of the motions to strike out.* They were well ruled, because:

(a). The master key, the prime and cardinal rule in construing a contract or law, is to ascertain the true

intent of either and enforce that. To this end there are auxiliary rules. For example, that the whole instrument is its own best interpreter; that the words should not be given a strained construction but a reasonable one; that a reasonable meaning of the words should, by implication, be read into the contract in order to attain a just result, one inherent to the very nature of the transaction. So, when there is call for it, the personnel of the parties, the circumstances surrounding them, and the subject-matter of the contract are taken as side lights to good exposition. Moreover, if there be a latent ambiguity in the contract words, then what the parties do under the contract is of value in clearing it up. Such practical construction by the parties themselves is but allowing their acts to clear up their ideas obscurely expressed—it is getting at the intent of the parties through what they say as construed by what they do. Within bounds, also, known, established and general usage may be read into the contract to get at the meaning of its language, when a doubt in regard to that meaning fairly arises on the whole instrument, keeping always steadily in mind that the exposition which springs from the very vitals of the contract is the fittest and most powerful.

But these mere subsidiary aids fill no office, at all, when the contract is plain and unequivocal. In such case interpretation and construction by implication, in reading provisions in or out, are not allowed. *Expressum facit cessare tacitum.* Again, where the suit is at law for damages for non-performance (as here) and not in equity to reform and reconstruct the contract because of mutual mistake, accident or surprise, it would be most unwise exposition to press mere aids to interpretation so far and so hard as to make, in effect, a *new* contract for the parties by adding vital and onerous terms by implication, unless no other just course is open. It is the settled policy of our law that contracts between individuals and munici-

palities are required to be in writing. Such public policy would have little force in producing wholesome results if caution were not exercised by courts in enlarging by implication the burdens assumed by such municipality.

The Frisco, under the law of this State, was not entitled to run its tracks on or across the streets of St. Louis without municipal leave first granted in apt and due form. (R. S. 1899, sec. 1035.) That the city could put conditions upon such use of its streets goes as of course, and one of the conditions it prescribed and which the Frisco accepted was that it should pay $15,000 for each bridge built by the city on thoroughfares crossing its tracks. It may not for a quarter of a century gather the fruits and benefits of its right of entrance on or over streets, and now repudiate the burden imposed as a condition, except on one high and stringent condition, *viz.*, that such repudiation be bottomed on a right arising from clear law.

The privilege granted by the city to cross its streets at designated points, if not in very strictness an exclusive privilege and monopoly, was in the nature of one. Therefore, in construing the contract creating such privilege it is a most just and wise principle of law that, if there are ambiguities, they should be resolved and construed in favor of the public.

In a celebrated case argued by Mr. Webster on one side and Mr. Greenleaf on the other (Charles River Bridge v. Warren Bridge, 11 Peters 420), TANEY, C. J., in speaking to the principle just announced, said (pp. 545-6): "And it would present a singular spectacle, if, while the courts in England are restraining, within the strictest limits, the spirit of monopoly, and exclusive privileges in nature of monopolies, and confining corporations to the privileges plainly given to them in their charter; the courts of this country should be found enlarg-

228 Sup—47

ing these privileges by implication; and constru-
ing a statute more unfavorably to the public, and
to the rights of the community, than would be done
in a like case in an English court of justice.'' A like
proposition is in Stein v. Bienville Water Supply Co.,
141 U. S. l. c. 80-1. Mr. Justice HARLAN, in pronounc-
ing the judgment of the court, said: ''If the contract
under which the plaintiff claims was doubtful in its
meaning, the result would not be different; for, while
it is the duty of the courts not to defeat the intention
of parties to a contract by a strained interpretation
of the words employed by them, it is a settled rule
of construction, that, 'in grants by the public nothing
passes by implication;' and, 'if, on a fair reading of
the instrument, reasonable doubts arise as to the proper
interpretation to be given to it, those doubts are to
be solved in favor of the State; and where it is sus-
ceptible of two meanings, the one restricting and the
other extending the powers of the corporation, that
construction is to be adopted which works the least
harm to the State. [The Binghamton Bridge, 3 Wall.
51, 75.]' ''

The principle so announced is a guiding one, and
if it has ever been overlooked or departed from in
cases, courts have returned to it again as abiding and
sound, concerning which there ought to be no dif-
ference of opinion.

So much by way of general observations pointing
the way to a just conclusion on the motions. Mindful
of them, we rule:

. (b). That the contract in question cannot be so
construed (either under the doctrine of ''practical con-
struction'' or by reading into it some custom) that
there shall be added the implied term that the city,
simultaneously with the building of the bridge, or as
a condition precedent to enforcing the payment of the
*pro rata* price agreed upon, should do away with the
grade crossing. We do not rule that under no cir-

cumstances such implication might not arise, but we do rule that, considering the subject-matter of the contract and the environment of the crossing under the Frisco tracks at Kings Highway, such term cannot be supplied here by construction impliedly. Here was a broad valley. The record shows there was a lumber plant and a brick plant in it supplying a great deal of freight to defendants. Those plants had constant need of the grade crossing in their business, and, under the evidence, were the only ones using it to any extent. They could not use the bridge. The bridge was primarily intended for through traffic on the thoroughfare, or at least for those going from the crown of the hill on one side of the valley to the crown of the hill on the other, and it would be most unreasonable to hold that the contract meant that the grade crossing should be entirely done away with. There is a time and place for all things, and the time for the Frisco railroad to have insisted upon an abandonment of this particular grade crossing, *in toto*, was in 1881 when it had the option to come in with the condition as it was written or to come in with an express modification of the condition (if it could get it) such as it now says arose by implication, or stay out. It is manifest that the mere fact that other grade crossings were abandoned does not amount to a practical construction of the contract as to the *locus in quo*.

Circumstances alter cases. The reason for abandoning a grade crossing at one crossing might not apply to another. Each case may be properly left to a wise exercise of municipal discretion as over against a matter of right. That is where the Frisco left it when it agreed to the contract. That is where we leave it now. The motion to strike out was well ruled in this particular. The matter pleaded was no defense.

(c). The same may be said of the ruling in regard to the custom and general usage pleaded. Defendants had the advantage of all evidence and rules

of law to which they were entitled, as pointed out in paragraph one of this opinion, when the court admitted their defenses relating to durability and dangerous construction to stand and allowed proof to sustain them. No custom can go beyond the reason of the custom. It is obvious that although the city might construct an iron bridge at one point, a steel bridge at another, or a concrete bridge at another, yet such bridge construction could not amount to a controlling custom or to a "practical construction" of the contract binding upon the city at another point and another time. The material of which a bridge should be built obviously must depend (so long as allowable material be used) on the state of the public funds, on the location of the bridge, its length, the amount and character of the travel. The Frisco contracted to allow the municipality a free rein and a wide range of discretion in this behalf. The general language can bear no other construction. It got into the city by virtue of the fact that it allowed the city such discretion. It must abide the contract as written in that particular, for it was the bridge that carried it over.

The conclusions announced cover the material features of the case. The declarations of law accord therewith. The cause was well tried and well decided. Accordingly the judgment is affirmed. All concur.