Ray SLOTKIN, Appellee,

v.

Edward W. WILLMERING, Appellant.

No. 71–1505.

United States Court of Appeals, Eighth Circuit.

Submitted May 19, 1972.

Decided July 25, 1972.

John R. McFarland, Thomas L. Croft, Peter W. Herzog, Jr., St. Louis, Mo.,

for defendant-appellant; Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., of counsel.

Mark R. Gale, Andrew F. Greensfelder, St. Louis, Mo., for plaintiff-appellee; Greensfelder, Hemker, Wiese, Gale & Chappelow, St. Louis, Mo., of counsel.

Before MATTHES, Chief Judge, VAN OOSTERHOUT, Senior Circuit Judge, and HEANEY, Circuit Judge.

VAN OOSTERHOUT, Senior Circuit Judge.

This is an appeal by defendant Willmering from final judgment awarding plaintiff Slotkin a balance of $175,600 for finding a buyer for Willmering's business. Willmering was the owner of Comet Tool & Dye Company (Comet) and related subsidiaries located at St. Louis, Missouri. Slotkin had sold machinery to and purchased machinery from Willmering over a period of years and a personal friendship had developed between them.

Slotkin learned from a friend who had been President of Zarkin Machine Company, which made the same kind of parts for airplane manufacturers as Comet, that Curtiss-Wright, who had purchased Zarkin, might be interested in other similar acquisitions. In May or June, 1967, Slotkin encouraged Willmering to sell Comet. A prospective purchaser was not then named. Slotkin obtained from Willmering a detailed list of Comet's principal assets to be included in a sale. Slotkin on various occasions by telephone and letter requested a written contract setting out the commission to be paid for finding a buyer for Comet.

On September 29, 1967, Wilmering sent Slotkin a commission agreement signed by him which had been prepared by Willmering's attorney. The agreement to the extent material here provides:

"You have expressed interest in obtaining a buyer for certain assets of mine and this is to outline the terms acceptable to me for giving you a non-exclusive right to procure a buyer to-

gether with terms of compensation for you which are acceptable to me." (The property to be sold is described in detail.)

■ "The minimum acceptable deal to me is $4,500,000.00 from which I would expect to retire approximately $500,000.00 of corporate indebtedness (on equipment) or, in the alternative, a minimum net sale price (with no obligation on my part to retire corporate indebtedness) of $4,000,000.00.

■ [a] "on any such deal procured by you and accepted by me I would be willing to pay you a commission of two and one-half (2½%) per cent on the gross sales price (that is, on, for example, the $4,500,000.00 price following which I would be expected to discharge the $500,000.00 of corporate indebtedness) or, [b] in the alternative, a commission of $150,000.-00 on such $4,500,000.00 gross selling price if the net price to me is $4,000,-000.00 with no obligation on my part to discharge the said corporate indebtedness. [c] Moreover if said gross selling price exceeds $4,500,000.00 I would agree to divide equally with you any excess of said gross selling price over $4,500,000.00.

■ "My obligation under this Agreement would expire if on or before December 31, 1967 you have not produced a buyer upon terms acceptable to me.

■ "It should be understood that, as above set out, this Agreement is nonexclusive. I may at anytime sell to a buyer procured by me or by anyone other than you and have no obligation to you for the payment of any commission on any such deal."

(The numbers and letters are supplied by us for convenient reference.)

The letter contract was received by Slotkin and the terms thereof accepted. On October 9, 1967, Slotkin by letter wrote Willmering as follows: "The customer that I have for the sale of your plant as a complete deal as per discus-sion is the Curtiss-Wright Corporation." There is a dispute as to whether Slotkin advised Curtiss-Wright that he had Comet for sale. Slotkin claims that he did so by sending an inventory and appraisement of Comet's assets to Curtiss-Wright. An inventory and appraisal was found in the Curtiss-Wright file which Slotkin identified as the one he had sent.

Willmering received a letter from Curtiss-Wright in early November 1967 inquiring whether Comet was for sale. Willmering's attorney Barkin responded in the affirmative. Additional correspondence requesting and providing information followed.

Curtiss-Wright's senior officials inspected the Comet plant in December 1967. Willmering and Barkin, at Curtiss-Wright's invitation, went to New Jersey to negotiate a contract in February 1968. Slotkin met them at the airport. Slotkin testified that Willmering introduced him to Barkin as the man who made the marriage.

A shake-hands agreement was reached in March for the sale of Comet to Curtiss-Wright. The formal contract was signed and the deal closed in June of 1968.

The parties are in agreement that the purchase price was $4,300,000.00 with the purchaser agreeing to assume and pay debts of the seller in the approximate amount of $500,000.00 referred to in the letter commission contract. The amount received apart from the debt assumption was reduced to $4,226,321.00 by reason of some offsets not disputed by anyone.

The case was tried to a jury. The trial court submitted to the jury the issue of the interpretation of the duration and quantity of performance provisions of the contract and the issue of whether plaintiff's performance met such provisions. The court, upon the basis of its prior determination that the contract was not ambiguous with respect to the compensation features of the contract, advised the jury that if the plaintiff prevailed he was entitled to a verdict for $175,660.00. The verdict was for the

plaintiff in such amount and judgment was entered thereon.

Defendant urges he is entitled to a reversal by reason of errors committed by the trial court as follows:

I. In instructing the jury that the plaintiff if found entitled to judgment was entitled to $175,660.00.

II. In failing to dismiss the complaint upon the ground the action is barred by the New York Statute of Frauds.

III. In excluding parol evidence of the negotiations preceding the execution of the contract.

IV. In holding plaintiff made a submissible case on the issue of performance.

We hold that the trial court committed no prejudicial error and affirm for the reasons hereinafter set forth.

## I

We agree with the trial court's conclusion that the compensation terms of the contract are not ambiguous and that under the terms of the contract plaintiff, if entitled to recover, should be given a verdict for $175,660.00 as the balance due for commission.

It is agreed that Willmering received as proceeds of the sale a net amount of $4,226,320.00 and in addition the buyer assumed the seller's obligations on equipment estimated at $500,000.00. The trial court computed the commission due on the contract as follows:

| | |
|---|---|
| $4,000,000.00 of net sale price under paragraph [3] [b]— | $150,000.00 |
| One-half of net sale price above $4,000,000.00 ($226,321.00) under paragraph [3] [c]— | $113,160.00 |
| Total commission— | $263,160.00 |
| Less agreed credits by payments on commission— | 87,500.00 |
| Balance commission— | $175,660.00 |

The commission under paragraph [3] [a] on a gross sale of $4,500,000.00 out of which Willmering would have to pay $500,000.00 in machinery indebtedness would be 2½% or $112,500.00.

Defendant argues that under paragraph [3] [a] the commission on the net of $4,226,371.00 received should be computed at the 2½% rate provided in [3] [a] which would amount to $105,658.00, and that commissions on transactions which yield the seller the same net amount of money should be the same, and that [3] [a] and [3] [b] are inconsistent with each other and hence ambiguous. The trial court rejected such contention, holding that the 2½% rate of [3] [a] applies to a gross minimum deal and the $150,000.00 commission in [3] [b] applies to a net minimum deal. The parties in paragraphs [2] and [3] clearly draw a distinction between a sale with a gross selling price and one with a net selling price, and incorporate in the agreement a definition of a gross sale and a net sale and support the definition by example.

The agreement reflects that the defendant approximated the debts to be assumed by the purchaser on a net sale to be $500,000.00 and thus set the minimum gross sale price at $500,000.00 above the minimum net sale price. No claim is made that the debt approximation is not substantially correct.

The trial court holds that the parties by the express provisions of their contract provide for a different commission on a net sale and a gross sale and that the fact that a net sale and a gross sale would allow substantially the same net amount is not persuasive on the ambiguity issue. The court states:

"The argument that the results differ is not persuasive. Defendant, through his attorney, wrote the provisions which are clear on the face of the writing. Presumably, it was worth more to the defendant that the sale be in net terms as defined by him. To hold otherwise would contradict the writing."

We agree. The parties are competent to contract. It may be worth something to

defendant to be relieved of the obligation of having to distribute the $500,000.00 owed to his creditors but it is difficult for us to understand why a seller would want to pay a substantially higher commission on a net sale than a gross sale, both of which would net him the same amount of money. However, we know of no legal obstacle which prevents the parties from making such an arrangement. The contractual issue is what commission is provided for by the contract that the parties made. Paragraph [3] [a] clearly fixes the commission on a gross sale; [3] [b] fixes the commission on a net sale. We agree with the trial court that the sale made is a net sale as defined by the contract and that the contract provides for a commission of $150,000.00 for a net sale at the minimum acceptable price of $4,000,000.00.

As heretofore pointed out, the sale netted Willmering $226,321.00 in excess of the $4,000,000.00 net for which $150,000.00 commission is provided. The trial court determined that paragraph [3] [c], which reads "Moreover if said gross selling price exceeds $4,500,000.00 I would agree to divide equally with you any excess of said gross selling price over $4,500,000.00," does provide further compensation, stating:

"Reading back, 'gross selling price of $4,500,000' was used in both definitions of the gross minimum deal, qualified by the $500,000 of expected corporate indebtedness, and in the net minimum deal defined to exclude obligation for the $500,000 indebtedness. The only reasonable interpretation of the compensation provision in regard to the excess price over the minimum deal in either gross terms or net terms as previously defined in the writing, is that the excess would be divided equally."

We consider this to be a reasonable interpretation of the extra compensation feature of the contract.

We agree with the defendant's view that the court under the guise of interpreting any contract cannot make a new contract for the parties. Such course was not followed by the trial court. Rather it applied the well-established rule that the issue of whether the contract is ambiguous is a question of law for determination by the court. See Eastmount Const. Co. v. Transport Mfg. & Equip. Co., 8 Cir., 301 F.2d 34, 41.

As stated in Morlee Sales Corp. v. Manufacturers Trust Co., 9 N.Y.2d 16, 210 N.Y.S.2d 516, 518, 172 N.E.2d 280, 282: "It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed."

Moreover, if any ambiguities in fact exist, the ambiguities are to be resolved against the defendant whose attorney drafted the contract. Rentways, Inc. v. O'Neill Milk & Cream Co., 308 N.Y. 342, 126 N.E.2d 271; Taft Broadcasting Co., WDAF AM–FM–TV v. N.L.R.B., 8 Cir., 441 F.2d 1382, 1384.

Defendant has failed to meet the burden resting upon him to show that the contract is ambiguous with respect to the compensation feature and that the trial court's interpretation of such feature is clearly erroneous.

II

Defendant's contention that the plaintiff's action is barred by the New York Statute of Frauds lacks merit. We may assume for the purposes of this opinion that a contract in order to conform to the New York Statute of Frauds must be in writing and "must, on its face and without the addition of parol evidence, contain the essential terms of the agreement." Ginsberg Machine Co. v. J. & H. Label Processing Corp., 2 Cir., 341 F.2d 825, 828.

Defendant contends that the letter agreement fails to adequately cover three essential elements of the contract:

1. The commission formula.
2. Duration of the contract.
3. Quantum of performance.

Our holding in division I establishes that the compensation formula is adequately

covered by the contract. The time for performance is definitely fixed as on or before December 31 by paragraph [4].

The question of whether the agreement adequately covers the quantum of performance presents a more difficult question. We note that paragraph [1] speaks of a non-exclusive right to procure a buyer on minimum acceptable terms, which are stated in paragraph

[2]. Paragraph [5] reserves the right to the seller to sell at any time to anyone except a buyer procured by plaintiff, without obligation to pay any commission to plaintiff on such deal. It is also noteworthy that the agreement does not place any duty upon the plaintiff except to procure a buyer who will meet the stated minimum terms.

The defendant by supplemental answer alternately raised a defense that the contract by reason of mistake did not express the intent of the parties. Such equitable issue was tried by the court without a jury; extensive evidence was received. The court determined that mistake had not been established. Such ruling is not attacked on appeal.

We are satisfied that the court properly determined the contract is adequate to satisfy the requirements of the New York Statute of Frauds.

### III

■ We believe there is no ambiguity in the contract which would permit the reception of extrinsic evidence to aid in its interpretation. We have heretofore held that the contract can be interpreted on the basis of the language contained in the contract as a whole. Under such circumstances, the court committed no prejudicial error in excluding parol evidence of prior negotiations with respect to the compensation issue. See National Surety Corp. v. Curators of University of Missouri, 8 Cir., 268 F.2d 525, 528; Goldstein v. Frances Emblems, Inc., 269 App.Div. 345, 55 N.Y.S.2d 740.

### IV

■ Our examination of the record satisfies us that there is substantial evidence to support a finding that plaintiff met the duration and quantity-of-performance provisions of the contract as we have interpreted such provisions. There are indications in the trial court's ruling that he considered such provisions to be ambiguous. The interpretation of a contract on the basis of its express language presents a legal issue for the court. We have heretofore expressed our view on the proper interpretation of the contract. The fact that the trial court submitted to the jury the interpretation of the duration and quantity issues created no prejudicial error as the jury by its verdict obviously reached the same interpretation on the contract that we have made. We do believe, however, that a fact issue was presented for the jury on whether plaintiff met the time and quantity of performance provisions of the contract.

We will not attempt to detail the voluminous evidence. Much of the pertinent evidence has been set out in the statement of facts. It is undisputed that plaintiff provided the defendant with the name of the ultimate purchaser in October of 1967, and that negotiations were entered into looking toward the sale shortly thereafter and that such negotiations were never broken off and resulted in the sale. Some of the delay in completing the sale was caused by delay in providing requested information. When Willmering and Barkin came to New Jersey in February of 1968, they were met at the airport by plaintiff and Barkin was told that plaintiff was the man who made the marriage. .

■ After the completion of the sale, defendant made three payments to plaintiff aggregating $87,500.00 to apply upon the commission. If contrary to what we have heretofore held the contract is ambiguous, the payment of the sums to apply upon the commission would have great weight as a practical construction of the

contract between the parties. See Aetna Casualty & Surety Co. v. United States, 8 Cir., 365 F.2d 997, 1002. The performance issue was adequately submitted to the jury by the court's instructions and the jury's verdict upon such issue is supported by substantial evidence.

The judgment is affirmed.