**NATIONAL CORPORATION, a corporation (Plaintiff), Respondent,**

**v.**

**Stephen J. ALLAN (Defendant), Appellant.**
**No. 29158.**

St. Louis Court of Appeals.

Missouri.

June 14, 1955.

Jesse E. Bishop, St. Louis, for appellant.

Cook, Fairfield, Howard & Murphy, Samuel B. Murphy, St. Louis, for respondent.

ANDERSON, Presiding Judge.

Plaintiff, National Corporation, by a contract dated October 3, 1948, employed defendant as a salesman to sell shuffleboards and accessories on a commission basis. The contract provided that on the termination of his employment defendant would not for six months thereafter directly or indirectly for himself or as an employee or agent of any other person engage in the business of selling shuffleboards. Defendant quit his employment with plaintiff on September 19, 1949. Thereafter, plaintiff brought this suit to restrain defendant from working for any firm selling shuffleboards or other coin-operated amusement devices, and to recover $10,000 actual and $10,000 punitive damages for breach of contract. On a hearing on the order to show cause, in December, 1949, the lower court restrained defendant from selling products similar to those of plaintiff until February 28, 1950. The injunction features of the case are not involved on this appeal.

By his answer defendant admitted his employment by plaintiff and the termination thereof on September 19, 1949. He denied any breach by him of the employment contract or that plaintiff had suffered any damages. Defendant's counterclaim alleged that under the terms of the contract he was entitled to earned commissions of $10,558.16 for sales made by him, but that he was paid only $6,099.08, leaving a balance due of $4,459.08, for which sum he prayed judgment, together with interest at the rate of six per cent per annum from December 9, 1949. Plaintiff's reply to defendant's counterclaim consisted of a general denial.

The case went to trial on the question of plaintiff's damages for the alleged breach of contract by defendant, and on the issues raised by the counterclaim. The jury found for defendant on plaintiff's cause of action, and for the defendant on his counterclaim in the sum of $4,459.08, together with interest in the amount of $1,040.51, or a total of $5,499.59.

In due course, plaintiff filed its motion for new trial, which was by the court overruled as to plaintiff's cause of action and sustained as to defendant's counterclaim, on the ground that the court erred in giving

defendant's Instruction No. 2. Both parties filed notices of appeal. Thereafter, plaintiff withdrew its notice of appeal, so that the only issue before this court is the propriety of the court's action in sustaining plaintiff's motion for new trial as to the defendant's counterclaim.

The commission schedule set out in the employment contract, as it affects matters herein at issue, provided:

"18% Commission on Factory Price for individual sales, at $596.00.
Selling Price $646.00

"$25.00 Commission per board on wholesale sales to operators.

"15% Commission on Orders for Accessories."

Shortly after the end of each month during which orders were received through defendant, plaintiff would forward to defendant a statement referred to in the evidence as a "Delivery and Commission Record," which showed the orders shipped, price, quantity, and commissions payable, together with a check for commissions less tax withholdings.

The "Delivery and Commission Records" indicated that on two shuffleboards delivered on December 28, 1948, defendant was paid a commission of $25, instead of $50, as provided in the contract. Also, from February 16, 1949, to August 13, 1949, defendant sold a total of $3,482.49 of accessories on which commissions would amount to $521.39, but on which plaintiff paid defendant $47.73, leaving a difference on these two items of $498.66 claimed due by defendant. The records also disclose that from January 24, 1949, to August 3, 1949, plaintiff shipped to Martin Acceptance Company (a trade name employed by one Martin Balensiefer), on orders taken by defendant, a total of 318 shuffleboards and paid defendant as commissions thereon the sum of $3,989.58. Defendant claims that under his contract he was entitled to $25 per board on these sales, or a total of $7,950, leaving a balance due him of $3,960.42.

Plaintiff's position at the trial was that said sums were not due defendant, and the real issue between the parties is whether the contract provision "$25.00 commission per board on wholesale sales to operators" applied to the sales made to Balensiefer. Plaintiff contends that Balensiefer was a "distributor", rather than an "operator", while defendant contends that Balensiefer was an "operator" as well as a "distributor", and that the provision in the contract was intended to cover all wholesale sales—to persons who operated as well as to those who resold shuffleboards—since there was no specific provision with reference to commissions on sales to distributors.

The trial court permitted the introduction of extrinsic evidence as an aid in the construction of the contract, and then by Instruction No. 2 submitted to the jury the issue as to whether the parties intended the commission rate specified to apply on sales to all persons or firms purchasing shuffleboards in wholesale lots. The propriety of this instruction is the issue before us on this appeal.

It appears from the defendant's evidence that in the shuffleboard business there are distributors, dealers and operators. A distributor was described by defendant as one who has an exclusive sales territory, warehouses merchandise, and sells shuffleboards to dealers and operators within the territory allotted to him. A dealer was described by defendant as one who buys the boards at wholesale and sells at retail from his floor room directly to operators. An operator was described, according to defendant's testimony, as one who purchases shuffleboards from a dealer or distributor and places them in various locations, usually taverns, retaining title, and dividing with the proprietor of such location the revenue derived from operation of the shuffleboards.

The factory price to operators was $450, and to dealers $417.50, according to defendant's testimony. According to plaintiff's testimony the factory price to distributors was $417.50.

At the time the contract between plaintiff and the defendant was entered into there were no distributors in the St. Louis area. It was a part of defendant's duties to set up such distributorships in said area. In December, 1948, defendant contacted Mr. Balensiefer and thereafter sales were made to the latter, the first shipment being on January 24, 1949.

It also appears from defendant's evidence that in December, 1948, considerable discussion was had between defendant and Mr. Paul Kotler, plaintiff's president, with reference to defendant's commissions on sales to distributors. Defendant made a trip to the home office during that month for the purpose of discussing his commissions on sales to distributors, but no agreement was reached with respect thereto. Thereafter, defendant, under date of January 11, 1949, wrote Mr. Kotler:

"In regards to our telephone conversation of the 8th of January, regarding distributor discount of 2% per board. This is not my idea of being taken care of. In fact, its the poorest commission I've received in all twelve years of selling. I've sold to distributors before and I know what the repeat business has been.

"I would not have quoted the price of $417.50 a board if you had not sent two of your company men down here and quoted that price. I feel that we are entitled to $15.00 per board on distributor's price, because we know that your distributor in Cleveland is trying to sell National Shuffleboards in my area.

"Paul, if this is not satisfactory with you, let me know at once, for I know 2% is too small considering the expense involved."

Defendant testified that this letter was with reference to an order taken through an agent of the Universal Distributing Company and had nothing to do with the boards sold to Balensiefer.

After writing the foregoing letter defendant had a further talk with Mr. Kotler in Chicago. He stated that Mr. Kotler proposed a 2% commission on sales to distributors. Mr. Kotler testified that an agreement for a 3% commission on such sales was entered into at this meeting. Three per cent on such sales would amount to $12.50 per board. Defendant denied there was any such agreement. Thereafter, sales were made to Balensiefer on which defendant was paid a commission of 3% of the sale price.

Defendant testified that his total sales of plaintiff's products amounted to $173,657.26, on which he was paid total commissions of $6,099.08, but that if commissions were computed at $25 per shuffleboard and 15% on accessories, the commissions would have amounted to $10,558.16, leaving a balance unpaid of $4,459.08. He further testified that the commission statements arrived from thirty to ninety days late, and that he protested the cut in commissions by letter, by phone, and in personal conversations with Mr. Paul Kotler, plaintiff's president, and was assured by the latter that the matter would be rectified. Defendant's letter of resignation, dated September 12, 1949, made no complaint regarding unpaid commissions, but did contain a complaint about his failure to get an expense check.

Another letter of resignation sent by defendant to plaintiff, under date of August 25, 1949, while giving plaintiff directions as to the forwarding of a commission check, and wishing plaintiff future business success, contained no statement whatever about overdue or past-due commissions earned. Likewise, the telegram of resignation sent August 24, 1949, giving seven days' notice of employment termination is silent as to any commissions owed. A telegram dated August 11, 1949, makes demand for defendant's commission check on sixty-four shuffleboards, but says nothing about unpaid commissions on previous orders or the rate of commissions to be paid on the specific sixty-four boards described.

Defendant testified that in his conversation with Mr. Kotler prior to signing the contract Mr. Kotler told him that his com-

missions would be 18% on retail sales of boards; 15% on accessories; $25 per board on wholesale sales; and the price of the boards at wholesale would be $450 each on drop shipments of less than carload lots of thirty-two boards. He further testified that when he asked Kotler the price on carload lots the latter said: "When you get someone who can buy thirty-two boards you contact me again." He further stated that the price at which shuffleboards were sold to Balensiefer was based on carload or truckload quantities, and was fixed by Mr. Kotler. Defendant further testified that during the conversation with Mr. Kotler prior to the signing of the contract nothing was said about differentiating between "operators" and "distributors".

Defendant, during the course of the trial, while denying that Balensiefer was a "distributor", characterized him as a "dealer", and then, in response to further questioning, stated that Balensiefer was both a "dealer" and an "operator". He admitted that Balensiefer paid a dealer's price of $417.50 for the shuffleboards purchased rather than the operator's price of $450 fixed by plaintiff.

The commission records which defendant received with his commission checks showed that the commissions were calculated on the basis of 3% of the sale price. Defendant testified he knew the basis of payment and, with that knowledge, he accepted and cashed the commission checks.

The trial court granted a new trial for the assigned reason that it erred in giving Instruction No. 2. By said instruction the jury were authorized to find for defendant on his alleged claim for commissions due on sales to Balensiefer if it found, among other things, that the phrase "$25.00 commission per board on wholesale sales to operators," in the employment contract "was intended by the plaintiff and defendant to apply to all persons or firms who purchased shuffleboards in wholesale lots, irrespective of whether such purchaser placed such boards in taverns on an income sharing basis, or resold such boards to others."

Appellant contends that the phrase in question was ambiguous and, for that reason, it was proper by said instruction to direct the jury to determine, as a question of fact, what the parties intended by the use of said language. Respondent's position is that it was the duty of the Court to interpret the contract as a matter of law, since its meaning was made clear by the extrinsic evidence offered and received at the trial.

■ In determining the meaning of a contract where there is a want of clearness in the language used, it is permissible to consider the nature of the agreement, together with all the facts and circumstances leading up to and attending the execution of the contract, the relation of the parties, the nature of the subject matter and the apparent purpose of the parties in making the agreement. Restatement of the Law of Contracts, sec. 235; St. Louis Union Trust Co. v. MacGovern & Co., 297 Mo. 527, 249 S.W. 68; North St. Louis Bldg. & Loan Ass'n v. Obert, 169 Mo. 507, 69 S.W. 1044; Velvet Freeze, Inc., v. Milk Wagon Drivers' and Inside Dairy Employees' Union, Local No. 603, Mo.App., 177 S.W.2d 644.

■■ Where the language of the contract on its face is not clear or is ambiguous, and resort to extrinsic evidence is necessary, if such evidence be conflicting, or, if not conflicting, different conclusions might reasonably be drawn therefrom, the construction of the agreement is for the jury under proper instructions from the Court. But where a contract is clear and unambiguous on its face, or where there is no real conflict of evidence upon any of the essential facts properly to be considered is construing the contract, and the true meaning of the words used is made clear by such evidence, it becomes the duty of the Court, and not the jury, to construe it. Keyes Farm & Dairy Co. v. Prindle, 249 Mo. 600, 155 S.W. 391; McFarland v. Gillioz, 327 Mo. 690, 37 S.W.2d 911; Ewing v. Von Nieda, 8 Cir., 76 F.2d 177; Geoghegan Sons & Co. v. Arbuckle Bros., 139 Va. 92, 123 S.E. 387, 36 A.L.R. 399; Straus v. Kazemekas, 100 Conn. 581, 124 A. 234.

In the case at bar the contract is rendered ambiguous by the use of the word "operators", and resort to extrinsic evidence was proper to resolve the ambiguity. From that evidence, which was adduced by the defendant himself, it appears that the word "operator" has an established meaning amongst those engaged in the business to which the contract has reference. An "operator", according to that evidence, is one who purchases shuffleboards and places them in various locations, usually taverns, retaining title, and dividing with the proprietor of such location the revenue derived from the operation of the shuffleboards. The defendant's evidence further shows that in the shuffleboard business there are dealers and distributors who do not come within the above definition, but who are engaged solely in the warehousing and sale of shuffleboards.

If it appears that an ambiguous term of a contract has an established meaning amongst those engaged in the business to which the contract relates, it should be treated, in interpreting the contract, as used according to that understanding, unless it clearly appears from a consideration of the entire instrument or the surrounding circumstances at the time the contract was made that a different meaning was intended. Metropolitan Exhibition Co. v. Ewing, C.C., 42 F. 198, 7 L.R.A. 381; 12 Am.Jur., Contracts, sec. 237, page 762.

There is nothing in the contract of October 3, 1948, or in the surrounding circumstances, which indicates that the parties used the term "operator" in a sense other than that in which it was understood in the business.

The fact that nothing was said between defendant and Kotler, prior to the signing of the contract, differentiating between operators and distributors, does not, under the circumstances, tend to prove that the parties intended, by the use of the phrase "wholesale sales to operators," to include sales to distributors. There were no distributors in the territory assigned to defendant at that time, and the price of $450 given defendant to be quoted was, according to defendant's own testimony, the sales price to operators.

Considering the language of the contract and the surrounding circumstances, it is our opinion that fair-minded persons could reach no other conclusion than that the parties intended by the use of the word "operators" to include only those persons who purchased shuffleboards for the purpose of operating them, and not for resale. This was the view of the trial judge, as appears from his memorandum filed in the cause at the time he sustained the motion for new trial. His findings and ruling were correct. The order appealed from is affirmed and the cause is remanded for new trial on defendant's counterclaim.

SAM C. BLAIR and WALTER E. BAILEY, Special Judges, concur.