**BUSCH & LATTA PAINTING CORPO-RATION, Plaintiff-Appellant,**

v.

**STATE HIGHWAY COMMISSION of Missouri, Defendant-Respondent.**

**No. KCD29715.**

Missouri Court of Appeals, Western District.

March 3, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 7, 1980.

Application to Transfer Denied May 13, 1980.

Samuel C. Ebling, James E. Robertson, Millar, Schaefer & Ebling, St. Louis, for plaintiff-appellant.

Bruce A. Ring, Chief Counsel, Paul Tochtrop, Asst. Counsel, Jefferson City, for defendant-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

DIXON, Presiding Judge.

This appeal has its genesis in a contract action brought by plaintiff, Busch & Latta Painting Corporation, a painting contractor, against the Highway Commission. The contract involved was for the painting of the Hannibal Bridge crossing the Mississippi River. Busch & Latta's theory of recovery was that the specifications for surface preparation were ambiguous and that the Commission's inspectors required an excessive amount of sandblasting, prior to the paint application, by reason of the ambiguity, which in turn caused damage by requiring expenditures not contemplated by Busch & Latta in the contract proposal. The jury's verdict was for the defendant Commission.

Busch & Latta's appeal raises issues concerning the argument, instructions to the jury, the admission and rejection of evidence, and the sufficiency of the evidence to support the verdict.

The last issue requires an extensive statement of the evidence. The transcript is in

three volumes, and there are are a great many exhibits. Some of the exhibits are extensive compilations of costs, both actual and estimated, by engineers and accountants.

The contract in issue was based upon bids received by the Commission in response to detailed specifications for the work to be performed. Busch & Latta were the low bidders, and their proposal and the bid specifications constitute the agreement. Thus, the written contract, with the exception of the bid price, was written by the Commission.

The dispute between the parties centers on the provisions of the contract relating to the surface preparation of the bridge. Because this specification is central to the dispute, Section "E" is set forth in relevant part as follows:

"All exposed . . . surfaces of metal . . . , shall be cleaned by sandblasting, meeting in all respects the requirements of Steel Structures Painting Council SSPC–SP–6–63 Commercial Blast Cleaning, except that all old paint must be removed and the surface, regardless of starting condition, shall be in the opinion of the engineer, at least equal to the appearance of pictorial Swedish Standard C SA 2 of SIS 05 59 00–1967.

. . . . .

All rust bloom shall be removed by re-blasting before coating and the surface ahead of the coating operation shall be constantly and diligently examined for any traces of rust, oil, grease, or other foreign blemishes not permitted by the blasting specifications."

The requirements of the Steel Structures Painting Council and the pictorial Swedish Standard, referred to in the contract documents above, were in evidence. The requirements of the Steel Structures Painting Council were contained in a publication titled, "Surface Preparation Specifications." "Commercial Blast Cleaning" is defined as follows:

"2. Definition

2.1 Commercial Blast Cleaning is a method of preparing metal surfaces for painting or coating by removing mill scale, rust, rust-scale, paint, or foreign matter by the use of abrasives propelled through nozzels or by centrifugal wheels, to the degree hereafter specified.

2.2 *A Commercial Blast Cleaned Surface Finish is defined as one from which* all oil, grease, dirt, rust scale and foreign matter have been completely removed from the surface and *all rust, mill scale, and old paint have been completely removed except for slight shadows, streaks, or discolorations caused by rust stain, mill scale oxides or slight, tight residues of paint or coating that may remain*; if the surface is pitted, slight residues of rust or paint may be found in the bottom of pits; *at least two-thirds of each square inch of surface area shall be free of all visible residues and the remainder shall be limited to the light discoloration, slight staining or tight residues mentioned above.* Photographic or other visual standards may be used as provided in the Appendix to modify or further define the surface if specified in the contract." (Emphasis supplied).

The term, "Pictorial Swedish Standard C SA 2 of SIS 05 59 00–1967," refers to a visual standard as a surface preparation specification. This standard was promulgated by the Swedish Standards Institute in a publication titled, "Swedish Standard SIS 05 59 00–1967."

These visual standards consist of photographic images, in color, of a steel surface which has been sandblasted. C SA 1 is reddish in color and is described as "light blast cleaning." The "C" refers to the prior condition of the steel and describes the surface as one on which mill scale has rusted away but no surface pitting is observable to the naked eye.

C SA 2 is dark grey in color and is specifically described as "Thorough blast cleaning, *almost* all mill scale, rust, and foreign matter shall be removed." C SA 2½ and C SA 3 are also grey in color but noticeably lighter and represent progressively cleaner surfaces. The Swedish Picto-

rial Standards are cross referenced to the requirements of the Steel Structure Painting Council and C SA 2 is supposed to represent a surface after application of a Commercial Blast Cleaning, SS PC SP 6–63, set forth above. C SA 2½ and C SA 3 refer to more extensive sandblasting described as "near white" and "white metal." The witnesses referred to these pictorial and verbal standards by the common terms, "commercial blast," "near white," and "white metal." It is an undisputed fact by the testimony and from the exhibits that costs increase from "commercial blast" to "near white" and "white metal" in that sequence because of the increase in both time and materials necessary to achieve the level of cleanliness these standards indicate.

The Commission's position is that the language of the surface preparation specification, "except that all old paint must be removed," was to be literally applied. Busch & Latta, on the other hand, contend that the removal of all old paint is conditioned by the exception in the requirements of the Structural Steel Paint Council definition that "slight tight residues of paint may remain," and "at least ⅔ of each square inch shall be free of all visible residues." The Commission position is, in effect, that since the picture standard referred to showed no variation in color, any discoloration was not up to the specification.

The whole difficulty arises because the pictorial standard (C SA 2) is, by definition, a piece of *unpainted* steel. Thus, more sandblasting was required to attain a uniform appearance of "no paint" than was required to reach the dark grey color shown in the pictorial standard. This resulted, on the job, in requiring the more expensive "near white" or "white metal" degree of sandblasting. In short, the Commission read the specifications so as to eliminate the exception for tight residues and discolorations. Busch & Latta read the specifications as calling for a "commercial blast," which, in the context of the definition referred to in the contract, did not mean a surface which was free of all paint residues and discolorations.

The surface preparation specifications SSPC–SP–6–63, relating to commercial blast cleaning, refer to the use of the visual standards as follows:

"A.8 Photographic standards of comparison may be used to define the final surface condition to be supplied under this specification. For partially rusted mill scale, for completely rusted mill scale, or for completely rusted and pitted surfaces, the appearance of the surface after Commercial Blast Cleaning should correspond with pictorial standards B Sa 2, C Sa 2, or D Sa 2 of SSPC–Vis 1–63T."

Significantly, the following language appears:

"As additional standards become available, particularly for initial surface conditions *such as previously painted steel,* these may be included by reference in the contract." (Emphasis supplied).

This indicates that the Commission adopted a visual standard that was at war with the verbal standard. C SA 2, the visual standard required by the contract documents, applies (by definition both in the Pictorial Surface Preparation Standards and in the Specifications for a "Commercial Sandblast") only to *previously unpainted* steel with "completely rusted mill scale." When these conflicting and inappropriate standards of cleanliness were applied to the *repainting* of the Hannibal Bridge, a classic example of an ambiguity in the application of contract language arises.

This complex recitation of the pertinent parts of the contract documents is essential to an understanding of the testimony developed at the trial. Several experts testified concerning these contract documents. Two of these experts were offered by the plaintiff, and three were experts offered by the defendant Commission.

The plaintiff's expert, Frank Masters, was an electrical engineer. He had worked as a designer, specification writer, draftsman, and inspector in connection with steel structures. In his opinion, the Commission's contract specification required only a "commercial sandblast" as defined by SSPC # 6. He testified that the wording, "all

old paint shall be removed," adds nothing to the specification but is included in the definition of a commercial sandblast. He emphasized that if something more than a commercial blast # 6 standard is required—such as a white or near white standard—that it should be called out specifically. The words, "except that all old paint shall be removed," do not provide a contractual basis for requiring a higher level of blasting.

Plaintiff also called Bob Hall, a salesman and former technical representative for the Carboline Company, which supplied the paint for the project. This witness was qualified as an expert on the basis of seventeen years direct experience in the work of painting steel structures, including bridgework. He had sandblasted and painted steel, not as a journeyman painter, but in the field as a technical representative for his company. He had assisted in the preparation of specifications and was familiar with the technical specifications called out in the contract, as well as the practical application of these specifications in the field. He had seen the standards referred to literally hundreds of times. He testified without equivocation that, based on that experience and his inspection of this particular project on several occasions, the Commission was requiring more than a "commercial sandblast" on the Hannibal Bridge project.

He further testified that over the period of his seventeen years experience, he had observed numerous projects which contained in the specifications the additional language of this specification, "remove all paint." His further testimony with respect to the instant bridge was that the inspector was requiring sandblasting in excess of what had been required in his experience with similar specifications. This witness was not permitted to directly testify concerning the presence or absence of an ambiguity in the Commission's specifications, a matter to be later discussed.

There was, however, no dearth of testimony concerning the ambiguous nature of the specifications. Plaintiff had called as an adverse witness the Commission's inspector on the project. The inspector admitted there was a conflict between the definition of a "commercial sandblast" and the language, "remove all paint."

Defendant's expert, Kenneth Tator, was a consulting engineer specializing in paints and protection coatings. His direct testimony deals largely with his qualifications and how he would have estimated the job. On cross examination, however, he testified that:

a) He would prescribe a minimum surface preparation for the zinc-vinyl system of a Commercial Blast Cleaning SSPC P 6.

b) In his opinion, the contract was capable of more than one interpretation: 1) the specific strict definition of Commercial Blast Cleaning # 6, and 2) conceivably, something above the minimum.

There does not seem to be much dispute as to the actual work performed. Busch & Latta began moving work crews to the Hannibal Bridge in May and began performing work under the contract shortly thereafter.

Late in May, a dispute arose between Busch & Latta and the Commission's inspector over the degree of sandblasting Busch & Latta was required to perform to prepare the surface of the Hannibal Bridge for painting. The inspector insisted that all visible paint be removed, and Busch & Latta protested. Various meetings between Busch & Latta representatives, the inspector, and various engineers resulted in the Commission taking the position that the contractor had to remove all old paint but that the visual standard did not have to be exceeded.

The evidence shows that the sandblasting required to remove "all visible paint" resulted in a "near white" or "white metal" blast in most areas. The sand estimated as necessary was six hundred tons, and over three thousand tons were used. The contractor accumulated 283 days penalty beyond the contract completion date. The

Commission concedes that the paint job was a good one, and one expert, who examined it before the trial in 1977, testified it was in excellent shape five or six years after the painting was done.

The Commission's inspector, who was on the job daily, asserted that he did not vary from his requirement that all old paint be removed and he, as well as the other Commission engineers, conceded that when all the old paint was off, the work was cleaner than the pictorial standard.

In summary, the evidence as to liability demonstrated the contract was ambiguous, Busch & Latta was required to adhere to the Commission's interpretation, and this required additional sandblasting beyond the Busch & Latta interpretation that only a commercial sandblast was required to meet the specification.

The evidence as to the damages is much less complex. Aside from the testimony of the experts and workmen on the extent of the additional sandblasting, the evidence as to damages came from Mr. Latta and an accountant. It was the purport of this testimony, supported by exhibits prepared from the books of the plaintiff company,[1] that the plaintiff's increased costs were $262,142 which, when added to the $23,800 penalty, aggregated the claim of $285,000 submitted. The Commission offered some evidence of labor troubles, inefficiency of workmen and equipment, as well as weather conditions, which may have affected plaintiff's costs. The extent of these offsetting items was never shown to the jury. An exhibit prepared for the purpose of showing the quantitative value of these offsetting items was denied admission by the trial court. The Commission, by cross examination, attacked the exhibits on costs in minor detail.

Before consideration of the issue of the sufficiency of this evidence to support the verdict, two closely related matters of procedure need some explanation. Initially, it should be noted that the evidence in this case, extending over the four days of the trial, was presented in a very disjointed fashion. There were two reasons for this. The first is the manner in which the evidence was presented and the case was tried. The trial judge made a commendable effort to understand the problems surrounding the language of the contract, but the court was not aided by the order of presentation of the evidence. The evidence concerning the actual work on the project was presented first, and the expert testimony on the meaning of the contract was put on later in the case. This led to a considerable amount of colloquy on objections that might have been obviated if the contract issue had been first explored.

Another factor affecting the presentation of the evidence was the almost continuous flow of objections. Counsel for the Commission zealously attempted to limit the testimony concerning the contract terms. These objections and the colloquy and conferences between counsel and the court so fragmented the testimony that the import of the expert's testimony concerning the meaning of the specifications was slow to emerge. For all the length of the transcript in this case, the actual live testimony is relatively short. The real crux of the trial occurred when all of the independent experts, including the Commission's expert, agreed that the contract was susceptible of two interpretations.

The second procedural area which requires mention is that of jury instructions. To assess the evidence in the instant case in the light of Busch & Latta's claim that the evidence is insufficient to support the verdict or, alternatively, that judgment not withstanding the verdict should have been entered in its favor, it must first be determined what the jury was instructed to find in order to reach a verdict. Four of the instructions bear directly on this determination.

The court gave the standard instruction on the burden of proof (MAI 3.01). As a

---

1. These exhibits have not been filed with this court, so no detailed statement can be made concerning the nature of the supportive data.

verdict director for plaintiff, the court gave the following not-in-MAI instruction:

"Instruction No. 4

Your verdict must be for Plaintiff if you believe:

First, plaintiff and defendant entered into a contract and

Second, plaintiff performed the contract and

Third, defendant failed to comply with said contract by requiring the plaintiff to perform sandblasting work in excess of the contract specifications, and

Fourth, plaintiff was thereby damaged."

The trial court, in the instruction conference, announced that he was satisfied that the contract was ambiguous and that the court would, and did, give the following instruction:

"Instruction No. 6

The evidence is that this contract is fairly open to more than one interpretation. In determining which interpretation you believe you must adopt the interpretation which is against the party who prepared the contract and adopt the interpretation of the party who merely signed the contract."

The trial court gave MAI 4.01 in its standard form using the word, "occurrence." Busch & Latta had proffered a modified MAI 4.01 which substituted the language, "the defendant requiring plaintiff to perform sandblasting work in excess of the contract specifications" for the word, "occurrence." In refusing the instruction using the alternative language, the court stated:

"That is my understanding from the facts as I've heard them, there is not more than one occurrence involved. The occurrence involved is the standard required, whether or not the standard required by the Highway Department with regard to sandblasting exceeded the contract, and that is one occurrence."

Against this factual and legal background, Busch & Latta argue that the court directed the jury to accept their version of the *contract specifications* that the specifi-

cation was for a commercial blast based on the definition of the Structural Steel Paint Council referred to in the contract, but contained in a document outside the contract.

At this point, it is necessary to note an important gap in both the instructions and the evidence. The lawyers and the court *assumed* without controversy that the reference in the contract to the detailed specifications and the definition of a commercial sandblast imported this material fact into the contract. In the absence of an instruction defining the contract or any clear statement in the evidence that the jury could consider this *definition* as a part of the contract, it is far from clear that the jury understood they could consider the detailed definitions external to the contract as a part of the "contract" referred to in Instruction No. 4. Busch & Latta assume in the argument on the sufficiency of the evidence that Instruction No. 6 required the jury to accept their interpretation of the contract which includes the important exception to the removal of all paint by permitting tight residues of paint and discoloration to remain on one-third of the surface. Based on that assumption, Busch & Latta argue the evidence showed they were required to perform work in excess of the specification to their damage.

On this assumption, the evidence of the Commission is not factually persuasive. The Commission points to the assertion of the Commission's witnesses that the Busch & Latta company was not required to achieve more than the pictorial standard *provided* all paint was removed, despite the virtual admission that removal of all paint necessarily involved reaching a visual standard higher than that specified. The Commission asserts also that the plaintiff, Busch & Latta, was inefficient and inexperienced. This evidence is in no way related to the enormous cost overrun shown by Busch & Latta's books. The real crux of the Commission's position is its attack on the trial court's determination of law as expressed in Instruction No. 6 above, that the ambiguity was to be resolved against the Commission.

The dichotomy of the arguments of the parties is thus not really one of fact, but of law. If the position of Busch & Latta that the trial court's declaration of the law is correct, and the facts are applied to that declaration on their assumptions, they were entitled to a verdict. At the very least, under that view of the instructions, the trial court should have granted the Busch & Latta request for a new trial because the jury's verdict demonstrated they had not followed the court's instructions.

The Commission, on the other hand, directly argues that the trial court improperly declared the law and that when the facts are applied under the appropriate rule of law, the verdict is a proper one. This assumes, as the Commission asserts, that the jury must determine the meaning of the agreement and, inferentially, the trial court's Instruction No. 6 is in error.

To demonstrate the unequivocal position of the parties on this issue as it relates to the sufficiency of the evidence, excerpts from the briefs make it abundantly clear. From Busch & Latta's brief, in referring to the effect of Instruction No. 6 upon this issue, the following appears:

"Under the instruction given by the Court, the jury could only conclude that the surface preparation specification required a Commercial Blast. Under the verdict director, the jury could find only that Busch & Latta was required to prepare the surface to a degree higher than that required by a Commercial Blast and was therefore required to perform sandblasting work in excess of the contract specifications."

The Commission's brief responds to the same issue in the following language:

"It is interesting to note that the Plaintiff has again taken the position that the Trial Court was *required* to adopt the Plaintiff's interpretation of the specification. This position, however, is contrary to the law that the interpretation of an ambiguous contract is for the jury upon the admission of extrinsic evidence."

In short, Busch & Latta claims the court directed the jury on this issue. The Commission claims that Instruction No. 6 represents only a direction that the jury find the contract specification issue upon all the evidence with Instruction No. 6 being directory only and not mandatory.

A review of the principles of construction applicable to contract disputes of this nature as developed in the case law must precede resolution of this problem. *Commerce Trust Company v. Howard*, 429 S.W.2d 702, 705–06 (Mo.1968), citing *National Corporation v. Allan*, 280 S.W.2d 428, 432 (Mo.App.1955), states the general rule concerning the respective role of the jury and the court in the construction of contracts in the following language:

"[W]here a contract is clear and unambiguous on its face, or where there is no real conflict of evidence upon any of the essential facts properly to be considered in construing the contract, and the true meaning of the words used is made clear by such evidence, it becomes the duty of the Court, and not the jury, to construe it."

■ Whether or not a contract is ambiguous is a question of law for the court, *National Corporation v. Allan, supra; Fitch v. Doke*, 532 F.2d 115 (8th Cir. 1976); *Slotkin v. Willmering*, 464 F.2d 418 (8th Cir. 1972); *Eastmount Construction Company v. Transport Manufacturing & Equipment*, 301 F.2d 34 (8th Cir. 1962).

■ *University City, Missouri v. Home Fire & Marine Insurance Co.*, 114 F.2d 288, 295 (8th Cir. 1940), states the general rule that ambiguities in written instruments may be of two kinds: (1) patent, arising upon the face of the document, and (2) latent, where the particular words, in themselves clear, apply equally well to two different objects. *Grantham v. Rockhurst University*, 563 S.W.2d 147, 150 (Mo.App. 1978), citing *Commerce Trust, supra*, states the principles to be applied when the contract is found to be ambiguous as follows:

"In construing ambiguous contracts the objective is to ascertain and render effective the mutual intent of the parties; and to achieve this objective the court will

consider the entire contract, subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances which cast light on the intent of the parties. *Leggett [v. Missouri State Life Ins. Co.,* Mo., 342 S.W.2d 833] *supra; Maschoff v. Koedding,* 439 S.W.2d 234 (Mo.App.1969); *Tri-State Gas Co. v. Kansas City Southern Railway Co.,* 484 S.W.2d 252 (Mo.1972), so long as that evidence is not contradictory of, repugnant to, or inconsistent with the terms of the contract. *Modine Manufacturing Company v. Carlock,* 510 S.W.2d 462 (Mo. 1974). It is only when the contract is ambiguous, and extrinsic evidence is proper, that construction of the agreement is for the jury under proper instructions from the court."

But the mere fact of ambiguity does not automatically require intervention of a jury.

"Where the language of the contract on its face is not clear or is ambiguous, and resort to extrinsic evidence is necessary, if such evidence be conflicting, or, if not conflicting, different conclusions might reasonably be drawn therefrom, the construction of the agreement is for the jury under proper instructions from the Court. But where a contract is clear and unambiguous on its face, or where there is no real conflict of evidence upon any of the essential facts properly to be considered is [*sic*] construing the contract, and the true meaning of the words used is made clear by such evidence, it becomes the duty of the Court, and not the jury, to construe it. *Keyes Farm & Dairy Co. v. Prindle,* 249 Mo. 600, 155 S.W. 391; *McFarland v. Gillioz,* 327 Mo. 690, 37 S.W.2d 911; *Ewing v. Von Nieda,* 8 Cir., 76 F.2d 177; *Geoghegan Sons & Co. v. Arbuckle Bros.,* 139 Va. 92, 123 S.E. 387, 36 A.L.R. 399; *Straus v. Kazemekas,* 100 Conn. 581, 124 A. 234." *National Corporation v. Allan, supra* at 432.

*National Corporation, supra,* in its holding, rules that it is error for a trial court to submit the issue of contract meaning where an ambiguity appears and where there was no conflict in the evidence and where fair minded persons could reach only one conclusion. This holding was premised on the following language:

"If it appears that an ambiguous term of a contract has an established meaning amongst those engaged in the business to which the contract relates, it should be treated, in interpreting the contract, as used according to that understanding, unless it clearly appears from a consideration of the entire instrument or the surrounding circumstances at the time the contract was made that a different meaning was intended. *Metropolitan Exhibition Co. v. Ewing,* C. C., 42 F. 198, 7 L.R.A. 381; 12 Am.Jur., Contracts, sec. 237, page 762." *Supra* at 433.

Thus, even if the contract be found to be ambiguous, the court must still declare the meaning of the contract unless the surrounding circumstances or other extrinsic evidence admitted on the ambiguity question raise issues of fact for the jury to resolve.

■ Another principle was extensively briefed and argued by the parties and relied upon by the trial court in framing the instructions in this case. The case to which the trial court referred as authority for Instruction No. 6 is *John Deere Company v. Hensley,* 527 S.W.2d 363, 365 (Mo. banc 1975), where the court, in declaring the law applicable to ambiguous contracts, said:

"The rule is well-established in Missouri that 'if a contract is fairly open to two interpretations that construction must be adopted which is against him who prepared it and favor him who merely signed it . . . . *City of St. Louis v. St. Louis & S. F. R. Co.,* 228 Mo. 712, loc. cit. 736, 129 S.W. 691.' "

Busch & Latta argues that this rule is mandatory and its application is required in every case where an ambiguity exists. The Commission, on the other hand, argues that

application of this rule is not irrevocable and unconditional, but rather that it is to be applied only when all other means of construction fail, allowing for consideration of the situation of the parties and the surrounding circumstances at the time of execution of the contract. *Isaac T. Cook Company v. Bank of St. Louis*, 297 S.W.2d 607, 610 (Mo.App.1957), and *Katz Drug Co. v. Kansas City Power & Light Co.*, 303 S.W.2d 672, 680 (Mo.App.1957).

In the context of the instant case, the principles stated do not lend themselves to easy application. No one disputes the ambiguity. As in *National Corporation, supra*, the ambiguous terms are used in the trade or business which the contract affects; and, at the very least, the expert testimony as to the meaning of the terms discloses a latent ambiguity in the specifications considering the contract language and the definition of commercial sandblasting contained in the publication of the Structural Steel Painting Council referred to in the contract documents. Nor can it be said upon the basis of the documents and the evidence in the *present record* that the ambiguity can be resolved by the court without resort to a jury determination. This is so because, under the present record, the expert testimony is only that *two* interpretations of the contract language are possible. There is some evidence bearing on the issues for jury consideration as in *Commerce Trust v. Howard, supra*. On the basis of these record facts and the principles thus far discussed, the issue in the instant case would appear to be one for determination by the jury.

There is still the vexing problem of the application of the rule stated in *John Deere, supra*. The problem stems in part from the necessary dilemma posed by a jury finding on the meaning of a contract, a finding which is often a mixed question of fact and law.

If the position of the Commission is taken literally—that the most favorable construction rule applies only in the instance where all else fails—it could never be of benefit to a party in contract litigation where there is evidence on some of the other factors, such as position of the parties, meaning of trade terms, or nature of the contract available for the jury to consider, no matter how balanced or equivocal that evidence might be. On the other hand, if the rule stated in *John Deere* is mandatory direction, it would eliminate a jury's finding of the contract's meaning in any case where two or more reasonable meanings can be ascribed to a contract written by one of the parties, without regard to other factors which might indicate the parties' intent.

■ The basic question to be determined in a contract ambiguity case is the intent of the parties. The most favorable construction rule is one of assumed intent. Thus, its use might be restricted to either cases where there is no extrinsic evidence sufficient to find intent or in a case where the evidence does not preponderate one way or the other, and there are equally reasonable and contrary meanings possible under the contract language. The rule rests on the common-sense belief that, when reasonable, contrary meanings of the language used are equally possible under all the facts and circumstances, the burden will fall on the party creating the dilemma.

■ If Instruction No. 6 is read as a peremptory instruction, as on its face it appears to be, it was inappropriate in this case. It was inappropriate in this case because there was some evidence in the record of circumstances indicating the intent of the Commission in drafting the specifications. The nature of the paint to be applied and the language of the Carboline Company's recommendation of the surface preparation, as well as the expert's testimony, at least by inference, that the use of the particular pictorial standard indicated more than a "commercial blast" was required, are all some evidence of intent. In any case where it is appropriate to use the most favorable construction rule as a direction to the jury, it will be in a case where there is no evidence extrinsic to the contract terms, in this case, it will be for the court to declare the contract *meaning* to the jury.

If on the other hand, Instruction No. 6 is considered only as a direction to the jury to

"apply as a standard," in the language of the trial court at the instruction conference, then it creates a hopelessly contradictory and confusing situation from the standpoint of the jury.

Paragraph third of Instruction No. 4 required the jury to find the fact of excessive sandblasting over the "contract" requirements. First, this arguably requires the jury to find the "contract" under paragraph first. The inherent ambiguity in the word "contract" in the light of the extraneous documents has already been mentioned. On the other hand, if the jury assumed that paragraph first of Instruction No. 4 required only the finding of execution of the documents, then in no way are they directed to make a finding on the specific fact in issue. What was the agreement as to surface preparation? In the light of Instruction No. 6 which directed the jury to adopt the construction of Busch & Latta as to the "contract" and which, read with Instruction No. 4, no place states as a finding for the jury the disputed contract term, the instructions become a quagmire of semantics. This jury could not possibly have been anything but confused by the instructions.

In any event, the instructions are in error for failing to utilize MAI 26.06, or some adaptation of it, in a case where the terms of the contract were in dispute. The trial court indicated that Instruction No. 4 was given "because the Court cannot find the MAI, nor can counsel, because it's not a pure breach of contract case." Whatever impelled the conclusion that this was not a breach of contract case involving a bilateral contract in which the terms were in dispute is unclear, but plainly, MAI 26.06 was the appropriate verdict director.

■ Some guidelines for appropriate instructions in such cases need explication. In any case where an issue of ambiguity exists, the terms of the contract are in dispute; and MAI 26.06 must be the starting point for the instruction of the jury. MAI 26.06 is a plaintiff's verdict director and, in the instant case, should set out the claim of the plaintiff as to the contract meaning in paragraph first and the claimed breach of defendant in paragraph third.

■ In addition to this instruction and the burden of proof instruction, some guideline by way of instruction must be tendered to the jury to direct them in their finding as to the terms of the contract in a case such as the instant one. Such an instruction should direct the jury to the issue to which it applies. Thus, it should initially state that "in determining whether or not the defendant agreed to the term of the contract set forth in paragraph first of Instruction No. —— (MAI 26.06), the jury should consider the following factors."

■ Paragraph First should then list the factors bearing on the jury determination that appear in the evidence of the case, such as situation of the parties, expert testimony as to the meaning of the terms, and any extraneous documents referred to in the contract itself. Paragraph Second should then direct the jury in some form of language as follows: "If upon a consideration of the evidence presented to you bearing upon the factors set forth in paragraph First, you are unable to ascertain the intent of the parties as to the meaning of the contract, then the court directs you that under the evidence in this case, the contract in question is fairly open to more than one construction and you shall adopt (plaintiff's or defendant's)[2] construction of the contract and render your verdict accordingly."

■ In a case such as the instant case where the contract included by reference extraneous material, the court should also give some form of definitional instruction to the jury as to the appropriate consideration of such extraneous documents.

Adverting now to the issue of granting a new trial to Busch & Latta on the ground that there was no evidence to support a verdict for the Commission, that claim of error must be denied. In view of the possi-

---

2. Depending upon the posture of the case, either the plaintiff or defendant may have written the contract.

ble confusion of the jury due to the inherent contradiction between Instruction No. 4 and Instruction No. 6, this court cannot conclude the jury ignored the instructions. Busch & Latta could not raise the issue of the error in the plaintiff's instruction; and, by the verdict for the defendant, any complaint by the Commission is foreclosed.

■■■■ The second issue raised by Busch & Latta on this appeal is the propriety of the argument to the jury by counsel for the Commission. The assertion is that the argument is contrary to the instructions of the court. The argument objected to is as follows:

"(MR. STUTT): This is what your assignment is in this case: your assignment is two things, you have to determine this contract provision. Is that clear? You either say it's clear or you don't say it's clear. That is why we are here. This is a public issue. *We want you to decide whether this contract provision is clear.* We think it's important because the function of the paint is to bear a load and that load is people.

My client said this contract provision is clear. O.K. So number one, that is one of your assignments. If you determine that that contract is clear—you know we've paid them money already.

MR. EBLING: That argument goes contrary to the Court's finding. The Court has found it—

THE COURT: You can argue his contention.

MR. STUTT: Thank you, Your Honor. Now, we have paid him $180,000. You have the burden to find for the defendant if you find the contract is clear, that's my client. If you find the contract is clear you can find for the Highway Department."

This raises a unique question because, as already stated, the instructions which this argument is said to contradict have already been determined to be confusing and contradictory. Missouri follows the rule that where the trial court overrules an objection to a misstatement by counsel in closing argument, thereby condoning the state-

ment, reversible error is "almost inevitable." *Halford v. Yandell,* 558 S.W.2d 400, 412 (Mo.App.1977); *White v. Gallion,* 532 S.W.2d 769 (Mo.App.1975); *Penn v. Hartman,* 525 S.W.2d 773 (Mo.App.1975); *Carrel v. Wilkerson,* 507 S.W.2d 82 (Mo.App.1974); *Jones v. Gooch,* 453 S.W.2d 653 (Mo.App. 1970). All these humanitarian negligence cases espouse the general rule that:

> "The permissible field of jury argument is broad, but the law does not contemplate that counsel may go beyond the issues or record and urge prejudicial matters, or urge theory of claim or defense which the law does not justify of [*sic*] which conflicts with the trial court's instructions submitting the issues of the case." *Carrel, supra* at 85.

While it is apparent that this rule applies in other than humanitarian doctrine cases, *Schmid v. Langenberg,* 526 S.W.2d 940 (Mo. App.1975) (unregistered securities); *Hoehn v. Hampton,* 483 S.W.2d 403 (Mo.App.1972) (sole cause of the plaintiff's injury); no contract cases have been found. Nor have any cases been found where the contradictory argument has been addressed to an erroneous instruction.

The rationale of this inflexible rule is apparent. The essence of a jury trial is a finding of fact by the jury under instructions of the court declarative of the law to be applied to those facts, resulting in a verdict one way or the other. The jury's task is difficult enough, as the present case so clearly indicates, without permitting counsel to inject confusion in the case by misstatements of law. The whole salutary purpose of the rule would be thwarted if it could be avoided on the ground that the argument was correct and the instruction wrong on the law. Strictly speaking, arguments on the law should be to the instructions which declare the law in the case, and certainly, argument contrary to the instructions cannot be permitted, or jury trials will become uncontrolled chaos.

Nor is the ruling of the trial court on such an issue a discretionary ruling. In *White v. Gallion* 532 S.W.2d 769, 771 (Mo. App.1975), the court stated:

"Misstatements of the law are impermissible in final argument and should be promptly corrected by the court. This proposition is well-stated in *Carrel v. Wilkerson*, 507 S.W.2d 82, 86[5] (Mo.App. 1974):

'While a trial court because of its coign of vantage of the proceedings and their affect on the jury, has a large discretion in permitting, restraining and purging final argument . . . , *there is no room for the exercise of judicial discretion on an issue of law.*' (Emphasis added)."

The Commission argues that under the factual posture of this case, each party was entitled to argue the logic and clarity of its own position. It further asserts that counsel for Busch & Latta, in arguing the reasonableness of the construction of the contract they were espousing, made the same argument to which the Commission's argument was retaliatory. It may be that retaliatory argument notions do not apply to misstatements of law; but in the instant case, the issue is not reached. Only the Commission's argument was designed to directly attack the trial court's direction in Instruction No. 6 that the contract was ambiguous. The argument should not have been made nor condoned.

■ The next issue is presented by the claim of Busch & Latta that the trial court improperly limited their expert testimony. As has been previously stated, the Commission made a mighty effort to keep the expert testimony concerning the meaning of the specifications from the jury when the expert for Busch & Latta, the paint salesman, was offered as a witness. Extensive voir dire was conducted by the Commission's counsel on the qualification of the expert, and a barrage of objections met every question propounded to him concerning the specifications. The trial court took the position that this expert could not testify as to the meaning of the specifications since that would invade the province of the jury. In sustaining that broad an objection to the testimony of this expert, the trial court was in error.

■ The trial court recognized Hall as an expert on surface preparation and paint application who had worked with the SSPC Specifications and Swedish Standards for about 17 years. The question of whether a particular expert qualifies as an expert witness in the field in which his testimony is sought rests with the sound discretion of the trial court. *Baker v. Ford Motor Company*, 501 S.W.2d 11, 18 (Mo.1973). Once the expert has qualified, the extent and nature of his training, experience, and competence that constitute his qualifications go to the weight of the testimony and become matters to be considered by the trier of facts. 32 C.J.S. *Evidence* § 458, Missouri Sources of Proof, MoBar CLE § 13.5.

The thrust of the trial court's ruling was that the expert could not testify in response to the following questions:

"Now, let me ask you the question again. Based upon your knowledge and use and familiarity with those two standards, what does the contract specifications call for?"

and

"Mr. Hall, I evidently misspoke myself. Based upon your experience and time spent in the industry with those specifications, would you tell this Court and jury what the customs and usage in the industry would indicate that that particular specification in Exhibit 9, the State Highway Department contract, would mean?"

It would serve no useful purpose to lengthen this already-lengthy opinion by reciting all the variations on a theme that counsel sounded in objecting to these questions. They all come down to the ultimate claim that these questions invade the province of the jury.

■ Missouri follows the general rule that where a written instrument contains words or expressions of a technical nature connected with some art, science, or occupation unintelligible to the common reader but susceptible of definite interpretation by expert, parol evidence is admissible to explain the language used. *Manhattan Oil Co. v. Mosby*, 72 F.2d 840 (8th Cir. 1925)

*cert. denied,* 293 U.S. 623, 55 S.Ct. 237, 79 L.Ed. 710 (1934).

"The rule applicable here is that, where the words have a technical or ambiguous meaning, evidence is admissible to show what persons engaged in that particular line of business have in mind when they use them." *Wentzel v. Lake Lotawana Development Co.,* 226 Mo.App. 960, 48 S.W.2d 185, 197 (1932).

*Hotchner v. Liebowits,* 341 S.W.2d 319, 328 (Mo.App.1960), makes it clear that a properly qualified expert may testify to conclusions which embrace ultimate facts stating as follows:

"It is not a valid objection to proper expert testimony that the answer states a conclusion of the witness as to a factual situation, *City of St. Louis v. Kisling,* Mo., 318 S.W.2d 221, and although it is on the very question to be ultimately decided by the jury, expert testimony is to be given the weight and credit the jury deems it entitled to, as is any other testimony. *Scanlon v. Kansas City,* 325 Mo. 125, 28 S.W.2d 84, *loc. cit.* 95."

The recent case of *McKinley v. Vize,* 563 S.W.2d 505 (Mo.App.1978) provides an excellent summary of the rules applicable to expert testimony. The court in *McKinley* found no error in allowing plaintiff's expert to offer his opinion as to whether defendant's failure to tell the anesthetist of decedent's asthma and not postponing the operation under the circumstances directly contributed to the death, over an objection that it invaded the province of the jury. The court stated:

"An expert opinion expressed by one properly qualified and based upon sufficient means of knowledge is evidence. The *province* of the jury is to hear all the evidence, including opinion evidence, to weigh it all, and to decide the issues. Thus an opinion, which is evidence, cannot invade the province of a jury in a strict sense, and this is so 'even though the opinion is upon the very issue to be decided,' and for that reason 'an objection that an expert opinion invades the province of the jury is not a valid one.' . .

"[E]very expert opinion to a certain extent 'invades' the province of the jury in the sense that it constitutes a conclusion gathered from the facts, but as stated in *State v. Cochran,* 356 Mo. 778, 203 S.W.2d 707, 713 (banc 1947) ' "An expert witness, in a manner, discharges the functions of a juror" because, in matters in which intelligent conclusions cannot be drawn from the facts by inexperienced persons, experts, "who, by experience, observation, or knowledge, are peculiarly qualified to draw conclusions from such facts, are, for the purpose of aiding the jury, permitted to give their opinion." ' " (Citations omitted). *McKinley, supra* at 510.

The trial court erred in not permitting the witness Hall to answer these questions on the objection stated. The evidence was highly persuasive and relevant on the principle issue in the case, and its exclusion was prejudicial to Busch & Latta. The Commission's assertion that he was not qualified, contrary to his qualifications expressly found by the trial court and amply supported by the record, is not persuasive.

■ There are other claims of error by Busch & Latta which will arise in any retrial of the case, and they must be dealt with in this opinion. The State offered, and the court admitted in evidence, a summary sheet showing the bid proposals of all three contractors who bid upon this project. Busch & Latta objected to the exhibit on the grounds that it was irrelevant to any issue in the case. The thrust of their argument with respect to irrelevancy is that the State failed to offer any proof that the bids of the other two contractors were for the same paint system as that bid by Busch & Latta. The request for proposal permitted the contractor to bid either upon a standard red-lead paint job or the vinyl system upon which Busch & Latta bid. The exhibit, as tendered with the court, does contain pencil notations under the printed form, a computer print-out, which indicate vinyl as being the system bid by all three contractors. The origin of this pencil notation is in no way explained in the record.

The Commission counters the claim by Busch & Latta of error in the admission of this document on the ground that Busch & Latta had itself offered bid prices of the other contractors as an exhibit in its side of the case. That might be a sufficient answer to the claim of error if the offer by Busch & Latta had indicated to the jury that all three of the bidders were bidding upon the same system. The Busch & Latta offer, however, contained no information that all three contractors were bidding upon the same system of painting and, therefore, it does not cure the relevancy problem demonstrated by the State's offer of the exhibit containing the pencil notations. It may well be that the evidence can be produced which will demonstrate the relevancy of the bids of the other contractors as being bids identical with the Busch & Latta bid in terms of the paint system to be applied. If that evidence is forthcoming at another trial, then the Commission would be entitled to offer the exhibit; and it would clearly be relevant upon the issue of whether or not Busch & Latta underbid the project.

 The court also refused to modify instruction 4.01 by inserting an appropriate phrase for the word "occurrence" in the standard MAI 4.01. The court said that in its view of the case, the occurrence was the specification and that there was only one such occurrence in the case.

However, in the retrial of this case, under proper instruction, the ultimate fact issue to be determined by the jury includes an ultimate fact with respect to whether or not the plaintiff was required to perform work in excess of the specification and that issue is the one which relates to the issue of damages. Damages do not flow in this case from the meaning ascribed to the specification. They flow from the state's inspection requirements in the implementation of the contract. The occurrence in this case is, therefore, not the specification, but the actions of the inspector in enforcing the specifications on the project itself. Instruction 4.01 should, therefore, be modified to properly instruct the jury that the "occurrence" is the act of the inspector in applying the specifications of the contract.

 Two final issues are presented. First, Busch & Latta attempted to offer 1973 Commission specifications calling for a "near white" blast as the surface specification for a zinc vinyl paint system. The trial court refused the offer. Busch & Latta argues that since the defendant had published the specifications in 1973 as its first "opinion" statement of what preparation was required and is arguing contra to those specifications in the instant case, the defendant is taking a position at trial that is inconsistent with prior conduct (both by admitting that a near-white blast was required and that the first specification was not clear), so the prior conduct of the defendant should be shown as being in the nature of an admission. *Durr v. Vick*, 345 S.W.2d 165 (Mo.1961).

First of all, this is not prior conduct. Likewise, as it might be relevant on the recognition of the ambiguity, the evidence is so clear on this issue that its use in a subsequent trial will have little relevancy on that issue. As to the intent of the Commission to require a "near white" blast three years later, the many factors which may have caused this change make the admission of this evidence under the particular facts of this case irrelevant on what they intended by the specification in question.

 The second issue raised is the attempt by Busch & Latta to prove by their expert that the blast on the I–70 bridge project was accepted by the inspector under the same specification. The parties have been advised by the briefing, and the point may not arise again. To further lengthen this opinion with a detailed discussion is unnecessary. Hall, the expert, was permitted to testify as to what the bridge surface preparation was. Busch & Latta did the work and could show its acceptance and the specification under which it was performed. The inference of over inspection on the Hannibal Bridge from these facts is relevant, and the evidence should be admitted, if properly offered. Any differences in the nature of the work and other factors weak-

ening the inference can be shown by the Commission.

Because of the cumulative prejudicial effect of the limitation of the evidence of the expert witness for Busch & Latta, the argument of counsel and the failure to show the relevancy of the bids of the other competitive bidders, this cause is reversed and remanded for a new trial on all issues in accordance with the directions in this opinion.

All concur.